## Case No. 10,362.

### In re NORWICH & N. Y. TRANSP. CO.

[17 Blatchf. 221.] [1]

Circuit Court, E. D. New York. Oct. 13, 1879.[2]

COLLISION — LIMITATION OF LIABILITY ACT OF MARCH 3, 1851 — LIBEL BY OWNER OF CARGO — APPRAISEMENT BEFORE AND AFTER COLLISION— PROCEEDS OF FIRE INSURANCE.

1. A collision occurred between a steamboat and a schooner, caused by negligence on the part of the former, without any design, neglect, privity or knowledge of her owners. She immediately took fire, and burned and sank in deep water, the fire being caused by the collision. She had a cargo, being carried on freight, which was totally lost. None of her pending freight was earned or received. She was raised and repaired. After that she was libelled, in admiralty, in the district court, by owners of part of the

[1] [Reported by Hon. Samuel Blatchford, Circuit Judge, and here reprinted by permission.]
[2] [Affirming Case No. 10,360. Decree of circuit court affirmed in 118 U. S. 468, 6 Sup. Ct. 1150.]

lost cargo. On a claim to her, she was appraised at $70,000, as her value after being raised and repaired, and she was released on a stipulation for that amount, purporting to be for the benefit of all persons having liens on her for losses by the collision. After decrees for the libellants, her owners petitioned the same district court, for the benefit of a limitation of liability under the act of March 3, 1851 (9 Stat. 635). That court appraised her value, as she lay immediately after the collision and fire and before she was raised, at $2,500, and ordered that amount to be paid into court. That was the value of the interest of the petitioners in her as she was immediately after the disaster. The value of that interest immediately before the collision was $70,000 At the time of the collision she was insured against fire and her owners received, on such insurance, over $49,000. She was not surrendered or transferred to a trustee: *Held*, that the value of the interest of the owner of the steamboat, to be taken, under said act, is not the value of her and her freight before the collision.

[Quoted in Thommasen v. Whitwill, 12 Fed. 897.]

2. The valuation of $70,000 is not to be taken as the measure of the liability of such owner. Such measure is the value of the steamboat in the condition in which she was immediately after the disaster, and not her value after she was raised and repaired. Such value in this case was $2,500, with nothing added for freight.

[Quoted in Thommasen v. Whitwill, 12 Fed. 897.]

3. After the collision, the value of the steamboat was not greater before the fire than after it.

4. The proceeds of the fire insurance ought not to be added to the appraised value of the steamboat.

[Cited in Insurance Co. of Pennsylvania v. The Waubaushene, 24 Fed. 560.]

5. It was proper for the district court to restrain the libellants in the suits in rem from further prosecuting those suits or suits against the stipulators for the $70,000.

[Appeal from the district court of the United States for the Eastern district of New York.]

This was a proceeding commenced in the district court, by the Norwich & New York Transportation Company, as petitioners, to obtain the benefit of the provisions of the act of congress, approved March 3, 1851 (9 Stat. 635), providing for the limitation of the liability of ship owners. The decisions of the district court in the matter are The City of Norwich [Case No. 2,762] and In re Norwich & N. Y. Transp. Co. [Id. 10,360]. After those decisions, appeals were taken to this court by several parties. This court found the following facts: "On the morning of the 18th of April, 1866, a collision took place between the steamboat City of Norwich, then owned by the petitioners, and the schooner General S. Van Vliet, then owned by William A. Wright and others. It occurred on Long Island Sound, nearly opposite Huntington, and it was caused by the negligence of the steamboat's officers or hands, without any design, neglect, privity or knowledge of her owners Very soon, within half an hour, after the collision, the boat took fire, her deck and upper works were burned off, and she sank in about twenty fathoms of

water. The fire was a direct consequence of the collision and inseparable from it. It was caused by the rushing of the water through the broken hull of the boat, whereby the fire was driven out of the furnaces upon the wood work, and the boat sank by reason of her filling with water. At the time of the disaster the boat had a cargo of merchandise on board, belonging to different freighters, all of which was totally lost. The freight then pending amounted to six hundred dollars, but none of it was earned, or received, by the ship owners. Sometime after the steamboat was sunk, and her cargo destroyed, as aforesaid, she was raised by salvors, taken to the Long Island shore, where she was repaired, and she was subsequently brought to the port of New York. On the 9th day of May, 1866, William A. Wright and others, the owners of the schooner, filed, in the district court for the district of Connecticut, a libel against the petitioners, the Norwich & New York Transportation Company, the owners of the steamboat, to recover damages in personam, for the loss of the schooner and her cargo, caused by the collision. To this libel an answer was put in, denying any fault of the steamboat; and the respondents also preferred a claim to the benefits of the act of congress of March 3, 1851 (9 Stat. 635), limiting the liability of ship owners. On the 23d of April, 1867, a final decree was made by this court, in favor of these libellants, adjudging to them and to the owners of the schooner's cargo the sum of $26,657.28. Wright v. Norwich & N. Y. Transp. Co. [Case No. 18,086]. From this decree an appeal was taken to the circuit court, where it was affirmed [Id. 18,087], and it was subsequently affirmed by the supreme court of the United States (Norwich Co. v. Wright, 13 Wall. [80 U. S.], 104). The affirmance by the latter court was at its December term, 1871. On the 23d of August, 1866, while the suit in the district court of Connecticut was pending, and after the steamboat had been raised, repaired and brought into the port of New York, George and Charles Place, two of the appellants, filed their libel in rem against her, in the Eastern district of New York, claiming as owners of part of her cargo. Other libels in rem were also filed at the suit of other owners of cargo. In due course the steamboat was seized by the marshal, and, the petitioners having intervened as claimants, an appraisement was ordered, and, a stipulation for the appraised value, in the sum of $70,000, having been given, the steamboat was released to them. Place v. The City of Norwich [Case No. 11,202]. The stipulation purported to be for the security not only of the Messrs. Place, but also for the benefit of all persons who might, by due proceedings in said court, show themselves entitled to liens upon the vessel by reason of the said collision. The appraisement was of the value of the vessel as it was after she had,

been raised and repaired. It was returned into the court on the 11th of March, 1867, and the stipulation in the amount of the appraisement was filed on the 29th day of the same month. On the 20th day of December, 1869, the district court ordered decrees to be entered in favor of the libellants, in all the suits commenced against the steamer, as aforesaid. The City of Norwich [Id. 2,760]. Such was the condition of the litigation when the present petition was filed, in July, 1872, after the rendition of the judgment by the supreme court, in the case of the libel of William A. Wright and others, in the district court of Connecticut. The petition prayed, that, in conformity with the act of congress, the decision of the supreme court, and the admiralty rules made in pursuance thereof (Yeager v. Farwell, 13 Wall. [80 U. S.] xii.), the court would cause an appraisement to be made of the value of the interest of the petitioners in the steamboat and her freight for the voyage in which she was employed, for which they were liable, and that an order should be made for paying the amount of such valuation into court, or for giving a stipulation therefor with sureties. It prayed, further, for a monition against all persons claiming damages arising out of the said collision and fire, citing them to appear and make proof of their claims, and it prayed, also, for a restraining order against the further prosecution of all or any suits against the steamboat or the petitioners, for any damages caused by the collision, fire and loss. There was, also, a prayer for general relief. The monition was issued, the appellants appeared, and an order was made for an appraisement of the amount of the value of the interest of the petitioners, as owners respectively of said steamboat and her freight pending for the voyage upon which she was employed, for which the petitioners were liable. A restraining order, as prayed for, was also made. Pursuant to the direction of the court [Case No. 2,762], an appraisement was made. The appraiser ascertained and reported the value of the steamboat as she lay immediately after the collision and fire, and before she was raised, to have been $2,500, and the district court confirmed the report (In re Norwich & N. Y. Transp. Co. [Id. 10,360]), and ordered the amount to be paid into the registry, which was accordingly done. The value of the interest of the petitioners in the steamboat, as she was immediately after the disaster, was $2,500, and no more. The value of that interest immediately before the collision was $70,000. When the collision occurred the steamboat was insured against fire (not against marine disaster), and upon the several policies the petitioners, as owners, have recovered from the underwriters the sum of $49,283 07. The steamboat itself has never been surrendered or transferred to a trustee for the persons injured by her fault."

J. W. C. Leveridge, for Norwich & N. Y. Transp. Co.

J. Langdon Ward and Kittridge & Rice, for owners of cargo.

R. H. Huntley, for William A. Wright and others.

STRONG, Circuit Justice. In Norwich & N. Y. Transp. Co. v. Wright, 13 Wall. [80 U. S.] 104, a case in which these petitioners, and some of the appellants, were parties, the act of congress of March 3, 1851 (9 Stat. 635), entitled "An act to limit the liability of ship owners, and for other purposes," was under consideration. Some things were then determined which I am not at liberty to disregard. Among them were the following: (1) The act adopts the rule of the general maritime law, as measuring the liability of ship owners for faults of the master, by which others are injured, and not the rules of the English statutes relating to the same subject; (2) the rule is applicable to the claims of all persons injured by a collision, as well as to claims by freighters of cargo on the offending vessel; (3) the present petitioners are entitled to the protection of the act against the owners of the colliding schooner; (4) they are not debarred by any laches of theirs; (5) the district court, sitting as a court of admiralty, has jurisdiction to administer the law. In that case, also, the proper mode of proceeding for obtaining the benefit of the act was pointed out, and the course directed has been substantially followed in the present case. An appraisement of the steamboat has been made, under the direction of the district court, and an apportionment has been ordered. The important question now, the question raised by these appeals, is, whether the sum to be apportioned has been correctly ascertained, and whether it is all that for which the petitioners, who are the owners of the steamboat, are liable.

The limit of liability prescribed by the act of congress is, that it shall in no case exceed the amount or value of the interest of the owner or owners in the offending ship or vessel, and her freight then pending. This presents the question—at what point of time is the value of the owner's interest to be taken? Is the measure of the owner's liability, or its maximum, the value of the ship and her freight before the injury was done? or the value at some time subsequent to the injury, when proceedings may be instituted to ascertain its amount? or is it the value immediately after the fault has been committed, as, for example, in a case of collision, immediately following the destruction caused by it?

Very clearly, it is not the former. The English statutes restricting the liability of ship owners do not adopt the measure recognized by the general maritime law. They measure the extent to which the owners of an offending vessel are liable, by the value

of that vessel immediately before the collision, adding the freight due, or to grow due, for and during the voyage; and they make no provision for the abandonment or surrender of the vessel. Such has been the construction given to them, first, by the courts of common law and chancery, and followed by the courts of admiralty. Brown v. Wilkinson, 15 Mees. & W. 391; Wilson v. Dickson. 2 Barn. & Ald. 2; Dobree v. Schroder, 6 Sim. 291; The Mary Caroline, 3 W. Rob. Adm. 101. The English courts have founded their judgments upon the statutes. They do not attempt to assert that such is the rule of the maritime law of the continent. Indeed, in England, the general maritime law has never been adopted, in all its breadth.

But it is the rule of that law which is to be applied to this case. Even if it were not the rule in this country. without the aid of any statute, (upon which I express no opinion,) it is the rule which congress has adopted and prescribed. By the maritime law, all that the sufferers by the misconduct of an offending vessel are entitled to is the vessel itself, after the injury has been committed, together with her freight. The liability of the owners is discharged by the surrender of the vessel and freight. Their loss, therefore, cannot exceed the value of the thing surrendered. What it may have been worth before the injury was committed is immaterial. Now, it is this measure of liability. recognized by the general maritime law, which the act of congress has adopted, instead of the English measure. It follows, necessarily, that the steamboat owners are not liable to the extent of the value of the vessel immediately before the collision. And such I understand to have been the decision in the case to which I have referred, reported in 13 Wall. 104.

The appellants contend, however, that, conceding the value of the vessel is to be estimated as it was after the collision, the measure of the owners' liability is not the value immediately after the collision. but the value at a subsequent time, when the vessel, or its equivalent value, shall be delivered into court by the owners, for the purpose of apportionment among the sufferers by its fault. or when, the vessel, or its value, being already in the custody of the court. the owners. or the persons injured by it, shall take the proper proceedings for an apportionment.

The collision occurred on the 18th of April, 1866. After the steamboat was raised, repaired and brought into the port of New York. she was libelled and seized, at the suit of sundry owners of her cargo. Having been claimed by her owners, an appraisement was ordered by the district court. and she was valued at $70.000, and released to her owners on their stipulating for that sum. This was in March. 1867, nearly a year after the collision. The appellants now insist that the sum ascertained to have been the value of the vessel at that time, by that appraisement, and then stipulated for, is to be taken as the measure of the owners' liability, and apportioned accordingly. To this I cannot assent. It is true. the present proceeding for an apportionment was not commenced until a later day; not, indeed, until the supreme court, by its decision and rules, had pointed out the course to be pursued to obtain the protection of the act of congress. But, the owners had claimed their right to the statutory limitation, alike in the libel in personam in the district of Connecticut. and in the suits in rem in the Eastern district of New York, though the right had not been accorded to them. But, independently of this, I am of the opinion that the sum at which the steamboat was valued in March. 1867, is not the measure of her owners' liability in these proceedings for an apportionment. That appraisement was in proceedings that had no relation to the question as to what is the extent of the owners' liability. Its purpose was to determine the value of the vessel at the time when she was seized, under the libels in rem filed by the freighters, and when she came into the custody of the court. and was claimed by her owners. It would have been unnecessary if the owners had surrendered her, and the stipulation for her appraised value was to enable them to recover possession of her. It was taken under the general powers and usage of admiralty courts, and not under the act of congress or the rules of the supreme court. Besides, the appraisement was one made of the value of the vessel at the time when she was seized by the marshal, after she had been raised at an expense of $22,500, and repaired at a cost of many thousand dollars more. It did not purport to be an estimate of her value at the time of the collision or immediately after. To hold that the owners are liable to the extent of that valuation, would be substantially to require them to surrender not only the ship and her freight. but also a sum of money equal to all they expended upon her in raising and repairs. Such, I think, would be a departure from the obvious meaning of the statute, and not required by the maritime law. Under that law, in cases of maritime abandonment, a seizure, or a judicial sale of the ship, if procured adversely to the owner, but without resistance by him, had no effect in determining the limit of his liability, and did not deprive him of his right to abandon, though the ship or its proceeds were thus brought within the jurisdiction of the court. 2 Pouget, Droit Mar. p. 412; Trib. of Commerce, Marseilles. 1828; Id. Aix, 1825. The stipulation for value given in March, 1867, cannot be said to estop the owners from showing what was the value of the vessel immediately after the collision. Nothing in it warrants such a construction.

I cannot doubt that the measure of liability recognized by the maritime law and by the act of congress is the value of the offending ship in the condition in which she was immediately after the disaster, adding the

freight. Then the claims of the persons injured arose, the claims, which the statute limits. The extent of the limitation is not a shifting one, varying with the times when the protection of the act may be sought, any more than it can be enlarged or diminished by the choice of the mode of obtaining that protection. Certain it is, that if, immediately after the collision, the steamboat owners had surrendered the vessel and freight, or transferred them to a trustee, they would have been discharged. Her value and her freight then pending were then all that they were liable for. That was then the extent of their loss. I cannot see how their liability can be increased by anything that may have occurred thereafter. It is the vessel as she then was that could have been transferred in satisfaction of all claims, if the owners had elected that mode of obtaining their discharge. And it is the value as it then was, which is the equivalent of the vessel, that might then have been paid in pursuance of an apportionment made by the court. Had the vessel proceeded on her voyage after the collision, and had she met with a second disaster, occasioned by the fault of the master, by which her value had been greatly reduced, could she then have been surrendered or transferred, in full satisfaction of the claims against her, or her owners, arising out of her first fault? Would her value after the second disaster have been the measure of the owners' liability? I cannot think such a position can be maintained. Surely, such is not the spirit of the statute. And, if not, it seems equally plain, that the liability of the owners is not enlarged by the fact that, after the collision, the boat has been raised and repaired by them, at large expense, or, in other words, has increased in value. It may, perhaps, be conceded, that if, after the vessel was raised and repaired, the owners had sought the protection of the statutory limitation, by transferring her to a trustee, the creditors would have been entitled to her as she then was, in her improved condition. This, not because her value then was the value for which they were, at all events, responsible, but by force of the transfer. But they have made no such transfer. They never offered to make one. They elected the other course of proceeding allowed to them by the law. They retained the vessel, and asked the court for an apportionment of the amount for which they were liable. To hold them now to the value of the vessel when she had been repaired, would practically deny to them the advantages of that election which the statute accords to them.

It is to be observed, that the act of congress not only adopts the maritime rule or measure of limitation, but it prescribes two modes, in either of which the ship owners may secure the benefits of the rule. The measure of liability and the modes allowed for obtaining the limitation are not to be confounded. One of the modes is the transfer by the owners of the vessel in fault, with her pending freight, to a trustee for those who may be legally entitled thereto. This is substantially the course pursued under the maritime law. The other is an apportionment by the proper court, on their petition, of the sum for which they are liable, among the parties entitled thereto, when the whole value of the vessel and her freight for the voyage is not sufficient to make compensation to each of them. In other words, the liability of the owners is discharged, either by transferring the vessel and freight, or by paying their equivalent, that is, the value of what they might have transferred in discharge, according to the apportionment of the court. The owners have their option of these two modes. They may give up the vessel and freight, or they may retain them and pay their value. But, the measure or limit of liability in each case is the same. Very plainly, it is not intended that the creditors shall obtain more when one mode of proceeding is adopted than when the other is followed. But, as I have said, all that the owners are required to transfer is the ship in her damaged condition, as she was immediately after the injury was inflicted. Equivalent to that is her value at that time.

I am, therefore, of opinion, that the district court was correct in determining that the value of the steamboat immediately after the collision and fire, as she then was, lying at the bottom of the Sound, together with her pending freight, is the extreme measure of the owners' liability, and is the amount to be apportioned. That value has been ascertained to have been $2,500, and I see no reason to doubt the correctness of the appraisement. It is true, that sum is the value of the vessel alone, without any thing added for freight. But, no freight was earned. Six hundred dollars was the amount pending at the time of the collision, but it was of no value. Had the owners selected the other mode of discharging their liability—that of surrendering or transferring the vessel and freight to a trustee—the fact that there had been six hundred dollars of freight pending would have been of no importance. The value of the subject transferred would have been only that of the vessel, the same as that which the district court fixed for apportionment. The transfer of the freight would have been the transfer of a valueless thing. And, as I have said, the measure of liability is the same, whether the vessel and freight be transferred, or whether their value be paid into court for apportionment. In neither case do the owners have more at risk than their sea venture. I think, therefore, the owners are not answerable to any extent for freight wholly lost, though it was pending at the time of the collision, for it had no value immediately after.

It was suggested, though not pressed, during the argument before me, that, even if the value of the steamboat in the condition

in which she was directly after the collision is the maximum of the owners' liability, the appraisement should have been made of her value in the interval between the collision and the fire. But, if this were conceded, the result must have been the same. Plainly, the vessel was worth no more then than she was after she had sunk. She was then a vessel inevitably doomed to partial destruction by fire, and to immediate foundering. The fire was as much a part of the original disaster as was the breaking of the hull by the impingement of the schooner, and so was the sinking. It is impossible to separate them. By the collision, the hull of the steamboat was stoven, and water poured in, driving the fire out of the furnaces into contact with the woodwork, which was mostly destroyed before the hull had sufficiently filled to cause it to sink. Now, had the owners transferred to a trustee the boat, at the instant after she came into contact with the schooner, and before the water had risen within her sufficiently to drive her fires out from the furnaces, confessedly, they would have been discharged. But, what would the trustee for the sufferers, the owners of the schooner and the freighters, have taken? Surely, only a vessel in process of destruction by fire, and destined to sink. She would then have been worth no more than she was at the bottom of the Sound, and that value the sufferers have now, under the appraisement that was made. Besides, a transfer could not have been made before the fire, because no trustee could have been appointed by any court.

I come, then, to the more important question, whether the proceeds of the fire insurance should have been added to the appraised value of the steamboat. At the time of the collision her owners had policies insuring her against fire, upon which they have recovered the sum of $49,283 07; and it is strenuously insisted, that the sum thus recovered should be added to the value of the boat and brought into the apportionment. This presents again the question—what is the limit of the liability of ship owners, defined by the maritime law, and adopted by the act of congress? As I have said, the sum to be paid into court for apportionment is the equivalent of what would pass to the trustee by a transfer under the statute. In substance, then, the question is this—according to the rule of the maritime law, or the act of congress, (which is the same,) does the limit of the owners' liability extend, beyond the vessel and her freight, to the insurance which may be upon her at the time of the disaster? The language of the statute is, "it shall be deemed a sufficient compliance with the requirements of this act, on the part of such owner or owners, if he or they shall transfer his or their interest in such vessel and freight, for the benefit of such claimants, to a trustee to be appointed by any court of competent jurisdiction, to act

as such trustee for the person or persons who may prove to be legally entitled thereto, from and after which transfer all claims and proceedings against the owner or owners shall cease." The subject to be surrendered is the interest of the owners in the vessel and freight. Not a word is said of transfer of insurance. A transfer of property insured is not, "ex proprio vigore," a transfer of policies of insurance thereon. Generally, indeed, it avoids the policies. It seems to have been held, in Lynch v. Dalzell, 4 Brown, Parl. Cas. 432, that insurances against fire do not attach on the realty, or in any manner go with the same, as incident thereto, by any conveyance or assignment, but they are only special agreements with the persons insuring against such loss or damage as they shall sustain. There is nothing in the act of congress to indicate that the transfer of the interest of the owner to a trustee was intended to have any different effect from that of an ordinary transfer of personal property, which neither in law nor in equity carries with it insurance, or any collateral contract. It seems to me, therefore, that, were I to hold that the owners are responsible, not only to the extent of the value of the vessel and her freight, but also for the insurance collected, I should, in effect, interpolate in the statute words which congress refrained from using, and extend the liability beyond the limits prescribed.

I do not feel the force of the suggestion, that, because the statute declares that the liability of the owner "shall in no case exceed the amount or value of the interest of such owner in such vessel" and her freight then pending, instead of declaring that it shall not exceed the value of the vessel and freight, something beyond the value of the vessel and freight, such as insurance, may have been intended; first, because a policy of insurance is no interest in the thing insured; and, secondly, because the words of the statute are plainly not designed to enlarge liability, but have, for their purpose, making provision for part owners of offending vessels. Instead of holding a part owner liable to the extent of the whole value of the vessel, they limit his liability to the value of his interest or share, leaving the other owners liable to the extent of the value of their shares. I cannot doubt such is the meaning of the statute.

There is nothing, then, in the act of congress, that extends the liability of the owners beyond that existing under the general maritime rule, and by that rule there seems to be no room for doubt that the liability does not extend to the surrender of insurance upon the abandoned vessel. Upon this subject the continental authorities are substantially in unison. Indeed, I have been able to find no one that asserts the rule is otherwise. Only one intimates an opinion to the contrary. I do not propose to quote these authorities at length. Copious refer-

ence was made to them by the learned judge of the district court, and I shall not repeat what he has said. His citations from Caumont (Dictionnaire de Droit Maritime, tit. "Abandon Maritime," §§ 54, 55), from the Code de Commerce, and from Pouget (2 Droit Maritime, 415, 419), are quite sufficient to show what the maritime measure of liability was, and long had been, when our act of congress was enacted, and to establish that it did not extend to insurance upon the abandoned vessel. I may add a quotation from Boulay-Paty. and one or two other sources. In his volume 1, p. 297, Boulay-Paty says: "The product of the insurance is the price of the premium which the ship owner has paid to insure the ship. This premium is not bound as a security for the debts and obligation of the captain. The law expressly binds only the ship and the freight to that. The Code of Commerce gives to shippers a lien only on ship and freight; consequently, they have none on the insurance. In general, the ship is not represented by the insurance, which, after the loss of the ship, becomes a right existing by itself, which gives a direct personal action in favor of the insured." "All these principles. besides, agree with equity and with the well understood interests of commerce." He says more to the same effect, and refers to Valin as sustaining him. So, in De Villeneuee et Massé, Dictionnaire du Contentieux Commercial, word "Armateur," 20, it is said: "The surrender of the ship and freight does not .extend to the insurance which the owner has put upon the ship." Other similar authorities might be cited. The subject has not been passed without debate. In 1841, an effort was made in the chamber of peers to amend the rule, so to make it require a surrender of the insurance procured by the owner, besides the ship and freight, in order to exonerate the owner. The proposition was much debated, but it was voted down. 1 Bédarride, du Com. Mar. 359. It was then declared. that, by the Code of Commerce. the ship owner is not required to bring in the insurance money, when he makes the maritime abandonment. Now it was in view of this rule limiting liability, and intending to adopt it, that the act of congress of 1851 was enacted, as was held by the supreme court in the case reported in 13 Wall. [supra]. The purpose of the act was to extend to American ship owners the benefits which the general maritime law gave, viz., to limit their liability as it was limited by that law. I find nothing in the act to enlarge the measure of liability. In the case in 13 Wall. 104, the court was not called upon to consider or decide whether the proceeds of insurance must be transferred, or accounted for, in addition to the vessel and freight. The question was not before the court, and it was not decided. Nor does Pardessus assert. as the doctrine of the maritime law, that insurance as well as vessel and freight must be abandoned to the freighters; certainly, not in the later editions of his work. At most he says, he had brought himself "to the belief, that, if the ship was insured, the creditors to whom the surrender was made would have the right to demand the amount of the insurance," for a reason, which he gives, that appears to me to be quite unsatisfactory. But he does not claim that such a right has ever been acknowledged (Droit Commercial, Ed. 1841); and, as I have said, I find not continental authority that recognizes it. I am, therefore, of opinion, that the petitioners in this case, who were the owners of the steamboat, are not bound to pay into the registry of the court the sum they received for insurance. I may add, that, after reflection. I am unable to perceive that the proceeds of fire insurance are any more liable for the claims of the creditors than those of marine would be.

Of the remaining questions presented by these appeals not much need be said. The appellants urge that they should not be restrained from the further prosecution of their suits against the steamboat. or against the stipulators for value in those cases. They argue, that, in the proceedings in rem the personal liability of the petitioners is not involved. and that the act of congress does not apply to such proceedings. The position thus taken cannot be sustained. It rests upon a very narrow view of the statute. A limitation of the liability of the owner of property is a limitation of resort to his property, at the suit of his creditors. Let it be conceded that the freighters had a lien upon the vessel. Yet, where the liability of its owner is discharged, the lien is gone. No liability can rest, upon the vessel which does not exist against the owner. The Druid, 1 W. Rob. Adm. 398, 399. It would be a strange anomaly, and one which would defeat the object of the act of congress, if, after an owner of a vessel had taken all the steps required to release him from liability, his property, that is to say, his vessel, should still remain liable to the claim from which he had been discharged. Neither the statute, nor the 54th and 57th rules in admiralty, justify such a conclusion. A suit in rem is, in a very proper sense, a suit against the owner of the thing, even though he may be unknown, and may, in fact, have no knowledge of the suit. And especially is this true. when, as in the present case, the owner appears in the suit and claims the thing attached.

I have only to add, that the taxation of costs, to which some of the appellants object, appears to me to have been correct.

It must be admitted. that the appellants recover a very inadequate compensation for the injuries they have sustained. On the other hand, the injuries were inflicted without any "privity or knowledge" of the owners, by the fault of the master of the steam-

boat, who remains liable to the fullest extent. And the act of congress limiting the liability of the owners, together with the proceedings under it, rest upon a public policy recognized throughout the commercial world, the policy of encouraging investments in ships, by limiting the liability of the owners for wrongs done by the master, to the value of the sea venture. The decree of the district court is affirmed.

[On appeal to the supreme court the decree of this court was affirmed. 118 U. S. 468, 6 Sup. Ct. 1150.]