Mr. Justice BRADLEY
 

 delivered the opinion of the court.
 

 The appeal brings up all the questions in the cause. The first one is which vessel was in fault.. And on this point we are satisfied from an examination of the evidence in the case with the finding of the District and Circuit Courts as to the responsibility of the steamboat for the happening of the collision. There is very strong evidence to show that the schooner’s light ivas burning brightly, it being specially examined both before and after the collision; and that the vessel could be seen, and was seen, by another steamer a full mile off just before the collision happened. The Electra was three-fourths of a mile in rear of the City of Norwich, directly in her track, and her officers saw the schooner some time before the occurrence. They saw her one point on their port bow when the City of Norwich was dead ahead. Now, the course of the schooner was nearly at right angles to that of the two steamers. If, therefore, she was one point on the port bow of the Electra, when a mile distant, it required but little calculation to show that at that time she must have been between an eighth and a quarter of a mile from the line of direction in which the two steamers were
 
 *115
 
 sailing. As she was making three or four knots an hour, and as the City of Norwich was making twelve, it must have taken the schooner, after this, two or fhree minutes to get up to the line of direction of the City of Norwich, during which time the latter would traverse nearly half a mile. So that when the schooner was first seen from the Electra she must have been half a mile distant from the City of Norwich, and, therefore, the theory of the claimants that she was only to be seen by reason of the lights from the City of Norwich shining on her sails, falls to the ground. If, therefore, she was seen from the Electra, more than a mile distant, she ought to have been seen from the City of Norwich, which was three-fourths of a mile nearer to her. All the circumstances mentioned by the pilot of the Electra corroborate these conclusions. He says that the schooner was a mile off from the Electra when he saw'ber, and that this was “
 
 two minutes before the
 
 collisionHe adds that the steamer City of Norwich blew her whistle immediately after the collision, and that he discovered the schooner two or three minutes before he heard the whistle. This evidence is adverted to, because it is of that circumstantial nature which often demonstrates the truth more strongty than the most positive testimony. It may be added that it is corroborated in many particulars by other evidence in the cause. As to her lights, it is-admitted, or at least clearly proved, that the schooner had a green light in the proper place; but several witnesses say it was a dim light. It is proper to observe that nearly all those who say this only saw the light after the collision, the shock of which may have temporarily affected the brilliancy of the lamp. But, without pursuing the subject further, it' is sufficient to say, that in our opinion the evidence is clear that the steamer was in fault in not seeing the schooner in time to prevent a collision. It was her duty to keep out of the way of the schooner; she was not only propelled by steam, but the schooner was beating against a head wind. So that every circumstance in the case cast the duty of avoiding a collision upon the steamer. Her liability is clear.
 

 
 *116
 
 The next question is, whether the owners of the steamer are entitled to the benefits of the act of 1851, limiting the liability of ship-owners to the amount of their interest in the vessel and her freight; and, if so, whether they can have relief in the District Court in the proceedings instituted against them. This involves the true construction of that act; and, to reach this, it may be useful to take a cursory view of previous legislation on the subject in other countries as well as in this.
 

 The history of the limitation of liability of ship-owners is matter of common knowledge. The learned opinion of. Judge Ware in the case of
 
 The
 
 Rebecca,
 
 *
 
 leaves little to be desired on the subject. He shows that it originated in the maritime law of modern Europe; that whilst the civil, as well as the common, law made the owner responsible to the whole extent of damage caused by the wrongful act or negligence of the master or crew, the maritime law only made them liable (if personally free from blame) to the amount of their interest in the ship. So that, if they surrendered the ship, they were discharged.
 

 Grotius, in his law of War and Peace,
 
 †
 
 says that men would be deterred from investing in ships if they thereby incurred the apprehension of being rendered liable to an indefinite amount by the acts of the master, and therefore, in Holland, they had never observed the Roman law on that subject, but had a regulation that the ship-owners should be bound no farther than the value of their ship and freight. The maritime law, as codified in the celebrated French Ordonnance de la Marine, in 1681, expressed the rule thus: “ The proprietors of vessels shall be responsible for the acts of the master, but they shall be discharged by abandoning the ship and freight.” Valin, in his commentary on this
 
 *117
 
 passage,
 
 *
 
 after specifying certain engagements of the master ■which are binding ou the owners, without any limit of responsibility, such as contracts for the benefit of the vessel, made during the voyage (except contracts of bottomry), says: “With these exceptions it is just that the owner should not be bound for the acts of the master, except to the amount of the ship and freight. Otherwise he would run the risk of being ruined by the bad faith or negligence of his captain, and the apprehension of this would be fatal to the interests of navigation. It is quite sufficient that he be exposed to the loss of his ship and of the freight, to make it his interest, independently of any goods he may have on board, to select a reliable captain.” Pardessus says:
 
 †
 
 “ The owner is bound civilly for all delinquencies committed by the captain within the scope of his authority, but he may discharge himself therefrom by abandoning the ship and freight; and, if they are lost, it suffices for his discharge, to surrender all claims in respect of the ship and its freight,” such as insurance, &e.
 

 The same general doctrine is laid down by many other writers on maritime law. So that it is evident that, by this law, the owner’s liability was coextensive with his interest in the vessel and its freight, and ceased by his abandonment and surrender of these to the parties sustaining loss.
 

 This rule, to a partial extent, was adopted- in England by the act of 7 George II, passed in 1734. By this act, after reciting that it was of the greatest consequence to the kingdom to promote the increase of the number of ships, and to prevent any discouragement to merchants and others from beiug interested and concerned therein, it was enacted that no shipowner should be responsible for loss or damage to goods on board the ship by embezzlement of the master or mariners, without his privity or knowledge, further than the value of the ship and her appurtenances, and the freight due thereon for the voyage; and, if greater damage occurred, it should be averaged among those who sustained it. By 26 George
 
 *118
 
 III (1786) this limitation of liability was extended to robbery and to losses in which the master and mariners had no part, and liability for loss by fire was entirely removed, as well as liability for loss of gold and jewelry, unless its nature and value were disclosed. By 53 George III (1813), the liability limitation of ship-owners was still further extended to cases of loss by
 
 negligence
 
 of the master and mariners, and to damage done to other ships and their cargoes, including of course, eases of collision. In the first two of these statutes it was provided that if the loss or damage fell on more than one party, either the parties injured or the ship-owners might file a bill in equity to ascertain the whole amount of loss on the one side and the value of the offending vessel and her freight on the other, so as to have a proper distribution of the latter,
 
 pro rata,
 
 amongst those who sustained damage. The last statute gave this remedy to the shipowners alone, it being for their benefit and intended to prevent a multiplicity of suits against them. But they were obliged to pay the value of the vessel and her freight into court, or to give security for the amount, and to acknowledge their liability, inasmuch as the court of chancery would not investigate the question of liability. That being done, they were entitled to a stay of all suits brought against them for damages.
 
 *
 

 Under these statutes the English courts, since the passage of the act of 53 George III (the question does not seem to have arisen before), have held that the value of the ship and freight was to be estimated as it stood immediately prior to the injury, so that if the ship were lost by the occurrence which caused it, or at any subsequent period before the completion of the voyage, the ship-owners were still liable for that value. The statutes contained no provision for a surrender and assignment of the ship and freight, but only for paying their value into court.
 
 †
 
 These decisions, it will
 
 *119
 
 be seen, create an important distinction between the English statute law and the maritime law.
 

 Statutes similar in principle to the English acts were passed in 1818 and 1821 by the legislatures of Massachusetts and Maine, differing slightly in form. They limited the liability of the ship-owner to the amount of his interest in the ship and freight for any embezzlement or damage occasioned by the master or mariners without his privity or knowledge, and provided that if the loss or damage were sustained by several persons, and should be more than the value of the offending ship and its freight, either the persons so injured or the ship-owner, or both, might file a bill in equity for discovery and payment of the amount for which the owner might be liable, among those entitled thereto.
 

 In 1841 the law of France was amended so as to operate still further to the advantage of the ship-owner, by enabling him to obtain, by abandonment of ship and freight, a complete discharge, not only from responsibility for the acts and defaults of the captain, but also for all his engagements and contracts relative to the ship and the voyage.
 

 In the light of all this previous legislation, the act of Congress was passed in 1851. As we have seen, by the maritime law, the liability of the ship-owner was limited to his interest in the ship and freight for all torts of the master and seamen; whether by collisions or anything else, aud sometimes even for the master’s contracts; and his liability was so strictly limited that he was discharged by giving up that interest, or by the vessel being lost on the voyage, and the maritime courts found no difficulty in carrying this law into execution. By the English law, as constituted by acts of Parliament, the owner’s liability was limited to the amount and value of ship aud freight at the time of injury, for damages to cargo and damages to other vessels by collision; but from the restricted jurisdiction of the English admiralty courts, in order to get complete relief where there were many persons suffering damage, the ship-owners were
 
 *120
 
 obliged to resort to a bill in chancery. The laws of Maine and Massachusetts seem to have limited the ship-owner’s liability in cases of damage to cargo alone; and for complete relief, they refer him to a proceeding in equity.
 

 The act of Congress seems to have been drawn with direct reference to all these previous laws, and with them before us, its language seems to be not difficult of construction. The first section exempts ship-owners from loss or damage by fire to goods on board the ship, unless caused by their own neglect. The second exempts the owners and master from liability for loss or damage to jewelry, precious metals, or money put on board the ship, unless its character and value be disclosed in writing. These two provisions were substantially contained in the English law of 1786. The third section, which is the one in question, is in the following w’ords:
 

 “The liability of the owner or owners of any ship or vessel, for any embezzlement, loss, or destruction, by the master, officers, mariners, passengers, or any other person or persons, of any property, goods, or merchandise, shipped or put on board of such ship or vessel,
 
 or for any loss, dam-aye, or injury by collision,
 
 or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, wit hout the privity or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner- or owners respectively, in such ship or vessel, and her freight then pending.”
 

 Here the owner’s liability is limited to the amount or value of his interest in the vessel and freight, but the section does not define at what time that interest is to be taken. The limitation embraces not only loss or damage happening to goods on board, but “ any loss, damage, or injury by collision.” The latter claim is independent of the preceding one. It cannot be read to mean, “loss or injury [to the goods ou board] by collision,” without an unauthorized interpolation. If it had said “ loss, damage, or injury [thereto] by collision,” it would have been coufined to the goods on board the vessel. But it does not so read. The section as
 
 *121
 
 constructed limits the ship-owners’ liability in three classes of damnge or wrong-happening without their privity, and by the fault or neglect of the master or other persons on board, viz.: 1st, damage to goods on board; 2d, damage by collision to other vessels and their cargoes; 8d, any other damage or forfeiture done or incurred.
 

 In view of the fact that the limited liability of ship-owners was, by the general maritime law, extended to all acts of the master except contracts for the benefit of the ship, and in most places even to these; and of the fact, that the English statutes expressly extended it to. cases of collision as well as to injuries to cargoes; we see no reason why the fair natural construction should not he given to the act of 1851, which makes an equally broad application of the rule, and there is nothing in the reason of the thing that should lead us to evade such a construction. The great object of the law was to encourage ship-building and to induce capitalists to invest money in this branch of industry. Unless they can be induced to do so, the shipping interests of the country must flag and decline. Those who are willing to manage and work ships are generally unable to build and fit them. They have plenty of hardiness and personal daring and enterprise, but they have little capital. On the other hand, those who have capital, and invest it in ships, incur a very large risk in exposing their property to the hazards of the sea, and to the management of seafaring men, without making them liable for additional losses and damage to an indefinite amount. How many enterprises in mining, manufacturing, and internal improvements would be utterly impracticable if capitalists were not encouraged to invest in them through corporate institutions by which they are exempt from personal liability, or from liability except to a limited extent? The public interests require the investment of capital in shipbuilding, quite as much as in any of these enterprises. And if there exist good reasous for exempting innocent shipowners from liability, beyond the amount of their interest, for loss or damage to goods carried in their vessels, precisely the same reasons exist for exempting them to the same ex
 
 *122
 
 tent from personal liability in cases of collision. In the one case as in the other, their property is in the hands of agents whom they are obliged to employ.
 

 We are, therefore, of opinion that the respondents were entitled to the benefit of the act of 1851, as against the claim of the libellants.
 

 But the claim of the libellants alone is not alleged to be greater than the value of the steamer and her freight. The libellants, therefore, would be entitled to receive the whole amount of this damage, if they were the only persons who sustained damage, or if, by reason of the nature of their claim, their lien was superior to that of the owners of the cargo lost on the steamer. Liens for reparation for wrong done are superior to any prior liens for money borrowed, wages, pilotage, &c. But they stand on an equality with regard to each other if they arise from the same cause.
 
 *
 
 We think, therefore, that the lien of the libellants for the loss of the schooner and her cargo, arising from the collision, is on an equality with the lien for the loss of the cargo of the steamer, from the same cause. This being so, the case for the application of the statute arises; for it is alleged by the libellants that the damage to the schooner and her cargo, together with the damage arising from the loss of the steamer’s cargo, greatly exceeds the value of the steamer and her freight for the voyage.
 

 We are, therefore, brought to the question whether the District Court had jurisdiction, under (he fourth section of the act, to grant the respondents relief by any proceeding to apportion the damages.
 

 As we have seen, it is declared by the third section that the liability of ship-owners for loss or damage, &c., shall not exceed the amount or value of their interest in the ship and her freight then pending. And by the fourth section it is provided:
 

 “ If any such embezzlement, loss, or destruction shall be suffered by several freighters
 
 or owners
 
 of goods, wares, or
 
 *123
 
 merchandise, or
 
 any properly
 
 whatever, on the same voyage, and the whole value of the ship or vessel, and her freight for the voyage, shall not be sufficient to make compensation to each of them, they shall receive compensation from the owner or owners of the ship or vessel, in proportion to their respective losses, and for that purpose the said freighters and owners of the property, and the owner or owners of the ship or vessel, or any of them, may take the appropriate proceedings in any court, for the purpose of apportioning the sum for which the owner or owners of the ship or vessel may be liable amongst the parties entitled thereto. And it shall be deemed a sufficient compliance with the requirements of this act, on the part of such owner or owners, if he or they shall transfer his or their interest in such vessel and freight, for the benefit of such claimants, to a trustee, to be appointed by any court of competent jurisdiction, to act as such trustee for the person or persons who may prove to be legally entitled thereto, from and after which transfer all claims and proceedings against the owner or owners shall cease.”
 

 The act does not state what court shall be resorted to, nor what proceedings shall be taken; but that the parties, or any of them, may take “
 
 the appropriate proceedings in any court,
 
 for the purpose of apportioning the sum for which, &c.” Now, no court is better adapted than a court of admiralty to administer precisely such relief. It happens every day that the proceeds of a vessel, or other fund, is brought into that court to be distributed amongst those whom it may concern. Claimants are called in by monition to present and substantiate their respective claims; and the fund is divided and distributed according to the respective liens and rights of all the parties. Congress might have invested the Circuit Courts of the United States with the jurisdiction of such cases by bill in equity, but it did not. It is also evident that the State courts have not the requisite jurisdiction. Unless, therefore, the District Courts themselves can administer the law, we are reduced to the dilemma of inferring that the legislature has passed a law which is incapable of execution.
 
 *124
 
 This is never to be done if it can be avoided. We have no doubt that the District Courts, as courts of admiralty and maritime jurisdiction, have jurisdiction of the matter; and this court undoubtedly lias the power to make all needful rules and regulations for facilitating the course of proceeding.
 

 It is to be observed, however, that if the ship-owner desires the intervention of the court, it will not be sufficient for him simply to ask for a
 
 pro rata
 
 reduction of the libellants’ damages, without, in some manner, tendering the corresponding
 
 pro rata
 
 compensation to which other parties, whose claims he sets up against the libellants, are entitled. Otherwise, he might reduce the libellants’ claim without ever being obliged to respond to the other parties. The libellants are, in fact, directly interested in the existence or non-existence of the other claims for damage. If these are established, they must suffer an abatement; if not, they will' be entitled to recover their entire damage. It follows, therefore, that the ship-owner must either admit the claims for damage which he thus sets up, or must ask the court to have them adjudicated. In the English practice, as the court of chancery does not investigate demands in admiralty, it. required the complainant (the ship-owner) to admit his liability in advance. This is, perhaps, not necessary in an admiralty court. But. it is, at least, necessary that, proceedings should be instituted for ascertaining the coexisting claims which are to antagonize and operate as a means of reducing the claim of the libellants.
 

 But in order to proceed regularly the court must have possession of the limited liability fund—that is, the proceeds or value of the ship and freight. It cannot distribute a fund of which it has not the possession. If the vessel were libelled, and either sold or appraised, and her value deposited in court, this sum, together with the amouut of the freight (when proper to be added), would constitute the
 
 res,
 
 or fund for distribution. The case would then be free from difficulty. But the present case is a libel
 
 in personam,
 
 in the District of Connecticut, and the steamer has, in fact, been
 
 *125
 
 libelled in the Eastern District of New York, and she, or her value, is detained there. The respondents have not paid, or offered to pa}, the fund into the District Court for the District of Connecticut. Nor do they allege that they have applied to the District Court for the Eastern District of New York, where the fund is, to apportion the damages incurred. Had they done this, that court might have acquired jurisdiction of the case, and made it the duty of the District Court of Connecticut, on being duly certified of the fact, to suspend further proceedings and leave the libellants to present their claim in the court of New York.
 

 The proper course of proceeding for obtaining the benefit of the act would seem to be this : When a libel for damage is filed, either against the ship
 
 in rem
 
 or the owners
 
 in personam,
 
 the latter (whether with or without an answer to the merits) should file a proper petition for an apportionment of the damages according to the statute, and should pay into court (if the vessel or its proceeds is not already there), or give due stipulation for, such sum as the court may, by proper inquiry, find to be the amount of the limited liability, or else surrender the ship and freight by assigning them to a trustee in the manner pointed out in the fourth section. Having done this, the ship-owner will be entitled to a monition against all persons to appear and intervene
 
 pro interesse suo,
 
 and to an order restraining the prosecution of other suits. If an action should be brought in a State court the ship-owner should file a libel in admiralty, with a like surrender or deposit of the fund, and either plead the fact in bar in the State court or procure an order from the District Court to restrain the further prosecution of the suit. The court having jurisdiction of the case, under and by virtue of the act of Congress, would have the right to enforce its jurisdiction and to ascertain and determine the rights of the parties. For aiding parties in this behalf, and facilitating proceedings in the District Courts, we have prepared some rules which will be announced at an early day.
 
 *
 

 
 *126
 
 The difficult}' with the respondents in this case is, that they have not taken the proper steps, in the proper court, to enable them to avail themselves of the benefit of the act. .The want of any uniform practice on the subject may, perhaps, be a sufficient excuse for not having done this. If proceedings are still pending in the Eastern District of New York it is not yet too late to initiate proper proceedings there for making an apportionment in the case. Meantime the decree already made must be allowed to stand at least for the purpose of showing the respondents’ liability to the libellants, and the actual amount of damage which the latter have sustained, as the basis of an apportionment. The court below will be instructed to suspend further proceedings on the decree until reasonable time has been given to the respondents to take the proper steps in the District Court, where the fund is, for settling and closing up the claims of all parties interested therein.
 

 This view of the case renders it necessary to determine another question arising in the cause for the guidance of the parties and the courts below. This is, whether the respondents, in order to avail themselves of the benefits of the act of 1851, may surrender the steamer itself, and any freight that may have accrued, under the fourth section of the act, without paying into court anything further, or whether they are bound to pay, or give security for, the value of the steamer at the time of the collision, and of the freight for the voyage. It will be necessary to know this at the first step in the proceedings. The probability is, that no freight ever actually accrued, as the cargo was never delivered in New York. Still, if the construction given by the English courts to their statute is to be followed, it matters not whether freight actually accrued or not. The owners would still be liable for what would have accrued had the voyage terminated prosperously; and it also matters not whether the steamer were lost or greatly injured. The owners would be liable for her value immediately prior to the collision.
 

 But it will be observed that the act of Congress contains a provision for the ship-owner to discharge himself, as in the
 
 *127
 
 maritime law, by giving up the vessel and her freight. This provision is not contained in any of the English or State statutes, and could not have been inserted in the act of Congress without direct reference to the like provision of the maritime codes. Could it have been inserted for any other purpose than to adopt the rule of that code? This is a question of much interest and importance.
 

 The Supreme Court of Massachusetts, in a case much considered,
 
 *
 
 adopted the English rule, and held that a shipowner, where the ship is lost, cannot have the benefit of the act, allowing him to relieve himself from responsibility by abandoning the ship and freight, because he cannot comply with its terms by assigning them. But surely, if the privilege exists when the vessel has been damaged at all (as it would seem that it must, if the act is to have any meaning), how can it cease to exist by any amount or degree of damage? And if the privilege exists, as long as there is anything left of the vessel to be transferred, it cannot cease when she is entirely destroyed. That would be to stand upon too nice a point of logic in giving a reasonable and practical construction to a statute. It would be to punish the unfortunate ship-owner, because his loss is total instead of partial. The late Judge Kane, of the Eastern District of Pennsylvania, in the case of
 
 Watson
 
 v.
 
 Marks,
 

 †
 

 held that the act had adopted the maritime rule, and his reasoning on the subject is very forcible and satisfactory. We do not hesitate to express our decided conviction, that the rule of the maritime law on this subject, so far as relates to torts, was intended to be adopted by the act of 1851.
 

 It is objected, however, that the fourth section of the act does not embrace cases of damage by collision, even though they are included in the third section. But an examination of the fourth section will show that its language is very broad. Coming immediately after, the provisions of the third section, which, as we have seen, provide for all kinds of loss, damage, and destruction (damage by collision in-
 
 *128
 
 eluded), it says, tliat if any such embezzlement, loss, or destruction shall be suffered by several freighters
 
 or owners
 
 of goods, wares, or merchandise, or
 
 any property
 
 whatever, on the same voyage, and the whole value of-the ship or vessel, and her freight for the voyage, shall not be sufficient, &e. Surely this language is broad enough to cover damage by collision, as well as other damages. And the close connection and dependency of the two sections, require a construction to be given to the one coextensive with that given to the other, if it can possibly be done without violence to the language.
 

 The decree of the Circuit Court will be affirmed, with directions to suspend further proceedings thereon until the respondents (the appellants in this court), shall have had such reasonable time as the Circuit Court may deem sufficient for taking the proper proceedings in the District Court for the Eastern District of New York, for apportioning the damage sustained by the various parties in this case. The costs in this court and the courts below to be equally divided between the libellants and the respondents. Also, process against the stipulators to be suspended to abide the event of the suit.
 

 Mr. Justice STRONG was not present at the argument in this case, and took no part in the judgment.
 

 *
 

 Ware, 187, 194.
 

 †
 

 Book 2, c. 11, g 13. His words are: “
 
 Navis ct eorum quae in navi sunt,”
 
 “ the ship and goods therein.” But he is speaking of the owner’s interest; and this, as to the cargo, is the freight thereon ; and in that sense he. is understood by the commentators.—Boulay Duty, Droit Maritime, tit. 3, § 1, p. 276.
 

 *
 

 Lib. 2, tit. 8, art 2.
 

 †
 

 Droit Commercial, part 3, tit. 2, c. 3, g 2.
 

 *
 

 See Abbott on Shipping, part 4, chap. 7.
 

 †
 

 See Abbotton Shipping, part 4, chap. 7, § 5; Wilson
 
 v.
 
 Dickson, 2 Barnewall & Alderson, 2; Cannan
 
 v.
 
 Meaburn, 1 Bingham, 465; Brown
 
 v.
 
 Wilkinson, 15 Meeson & Welsby, 391; Dobree
 
 v.
 
 Schrœder, 2 Mylne & Craig,
 
 *119
 
 489; The Mary Caroline, 3 W. Robinson, 101; Leycester
 
 v.
 
 Logan, 3 Kay & Johnson, 446.
 

 *
 

 Maclachlan on Merchant Shipping, 598.
 

 *
 

 See these
 
 Rules,
 
 supra,
 
 vii.
 

 *
 

 Walker
 
 v.
 
 Insurance Company, 14 Gray, 288.
 

 †
 

 2 American Law Register, 157.