Thommasen and another *v.* Whitwill and others.

(*Circuit Court, E. D. New York.* 1882.)

1. Collision—Between Foreign Vessels—What Law Governs.
    Where a collision at sea occurred between two vessels of different foreign nations, and no law of either country is proved as a fact, the case must be governed by the provisions of the statute of the United States.

2. Same—Limited Liability of Owners.
    The liability of the owners of a colliding vessel for damages caused by a collision is the value of the offending vessel after the collision and at the end of her voyage, with her pending freight.

3. Same—Offending Vessel Lost after Collision—Measure of Liability.
    Where a vessel, after colliding with another vessel at sea, was herself lost in the continuance of her voyage, and was abandoned to underwriters, the liability of her owners is limited to the amount realized by the sale of the wreck by the underwriters.

*Henry T. Wing, C. Van Santvoord,* and *H. Putnam,* for appellants.
*Foster & Thomson* and *R. D. Benedict,* for respondents.

In this case I find the following facts:

The bark Daphne, of Arendal, Norway, where she was built, left Baltimore, Maryland, in good condition, on the eighteenth of March, 1876, with a cargo of crude petroleum in barrels, bound to Marseilles, France, and passed out to sea on the twentieth of March. On the twenty-fifth of March, from 20 to 30 minutes after midnight, the Daphne was run into by the British steam-ship Great Western, bound from Gibraltar to New York with a cargo of merchandise. The place of collision was on the high seas, 175 to 180 miles from Sandy Hook; about 150 miles from the beach near Fire Island light-house, on Long Island. The weather at and before the collision was fine. The night was dark, but there was no difficulty in seeing lights at a great distance on the water. The wind was about E. S. E. The course of the Daphne was between N. E. and N. E. ½ N. She was sailing by the wind, on her starboard tack, and had the usual regulation lights—green on her starboard side and red on her port side—properly placed and burning brightly, and was keeping a good lookout. The white mast-head light of the steam-ship was seen from the bark at about 11 o'clock p. m. at a distance off, as estimated, of about 12 miles, and about four points on the bark's starboard and weather bow, and afterwards the steam-ship's red light was seen from the bark. From the time of the first observation by the bark of the white light of the steamer the bark, with all her sails set, except the main-royal and gaff top-sail, was kept on her course N. E. to N. E. ½ N., sailing by the wind, making about six miles an hour, and without any change of her course by the action of her helm until the steamer was coming into her, and was within a distance off of about two of her lengths, and angling a little from aft of the bark towards the bark's bow, as on a port helm, when an order was given to the wheelsman of the bark to keep off, and the bark had fallen off a little when she was struck by the stem of the steam-

ship aft of her fore rigging on her starboard side, the steam-ship cutting into the starboard side of the bark, down from the rail, and into the beam, breaking the water-ways and plank, and doing other damage, which made it necessary for the bark to put back for repairs.

The steam-ship was on a course, before the collision, N. W. by W., crossing that of the bark, and, without sails set, was making between seven and eight knots an hour. The green light of the bark was seen from the steam-ship at a distance off of six or seven miles, bearing W. by S., seven points on her port bow. The steam-ship kept on her course without changing it until she was too close to allow her to go under the bark's stern, and then her helm was ported hard a-port, to bring her around to the starboard and leave the bark on her port hand, in which maneuver she struck the bark aft of her fore rigging, as aforesaid, stem on, after an order was given to stop her engines and reverse full speed, as the bark was falling off.

The libellants sustained damages from the injuries to the bark by the collision, as allowed by the district court, in the sum of $17,023.44. The value of the steam-ship at the time of the collision, whether ascertained by reference to her condition before the collision, or to her condition after the collision and before her stranding, was from $140,000 to $150,000. The libellants are, and were at the time of the filing of the libel herein and of said collision, residents of Arendal, in Norway, and subjects of the kingdom of Norway and Sweden, and there domiciled, and owners of said bark.

The respondent Mark Whitwill was at the same times a resident of Bristol, in England, and a subject of the united kingdom of Great Britain and Ireland, and there domiciled, and one of the owners of the said steam-ship.

After the said collision and on the same twenty-fifth of March, while still on said voyage, and before reaching New York, the said steam-ship was stranded and wrecked on the southern coast of Long Island, from a cause in no way growing out of or connected with said collision, and not directly from any peril at sea, or without the act of man mingling with it, but by the careless navigation and fault of those in charge of her. No freight is shown to have been received on said voyage. The owners of the said steam-ship, on the twenty-eighth and twenty-ninth of March, 1876, duly made an abandonment of the said steam-ship to the various underwriters who had insured her. Before and at the time of said stranding the said steam-ship was under insurance effected by the owners thereof to the amount of £34,000, which they realized from the insurance companies by the payment to them of that sum as for a total loss, after tender of an abandonment. After said abandonment, and on various dates down to the twelfth of May, 1876, the wreck of the said steam-ship and the materials saved therefrom were duly sold at public auction for account of whom it might concern. Such sale was duly and publicly advertised in the city of New York, but no notice of it was otherwise given to the libellants. It was made for the account of the said underwriters, and was pursuant to the directions from the owners, and after paying the expenses of saving and selling the property it realized the sum of $1,796.14.

On the twenty-seventh of March, 1876, the master of the said bark, acting as agent for the libellants, who were not then in this country, commenced this action in their names. The respondent Whitwill was not in this country.

A process of foreign attachment against the property of the respondents was issued, under which the steamer Cornwall, in which the respondent Whitwill had any interest, was attached, and he appeared generally and answered in the cause. On the trial in the district court, and also on the trial in this court, his answer was ordered to be amended, by adding at the close of the seventh article thereof the words "and he hereby surrenders the same to the libellants." On the trial in the district court, and also on the trial in this court, the counsel for the respondent Whitwill tendered to the other side, in open court, a paper of which the following is a copy, and asked the court to note the fact, and also put in evidence the said paper, subject to objection then made by the libellants, counsel:

"Know all men by these presents, that I, Mark Whitwill, of Bristol, England, heretofore part owner of the steam-ship Great Western, do hereby surrender to Jens Thommasen and Julius Smith, of Arendal, Norway, owners of the bark Daphne, all my interest in the said steam-ship Great Western and her freight, as of the date of March 25, 1876.

"In witness whereof I have hereto set my hand this nineteenth day of April, 1877.  MARK WHITWILL,
"by W. D. MORGAN, Agent.

'In presence of CHAS. F. WELLS.

*"City and County of New York—ss.:*
"On this nineteenth day of April, 1877, before me personally came William D. Morgan, to me known, and known to be the same person described in and who executed the foregoing instrument as the agent of Mark Whitwill, therein named, and to me known to be such agent, and he to me acknowledged that he executed such instrument as and for the act and deed of the said Mark Whitwill.  CHARLES F. WELLS, Notary Public, New York."

Such paper was executed by the duly-authorized agent of the said Whitwill, and its execution was thereafter ratified by said Whitwill.

On the trial in this court the counsel for the respondent Whitwill offered to produce a paper, to be signed by said Whitwill, by said Morgan, as his attorney, in all respects like the one above set forth, dated April 19, 1877, except containing a transfer to a trustee for the benefit of the libellants, under the provisions of section 42851 of the Revised Statutes of the United States, if the court should be of opinion that such transfer to a trustee, and not a surrender to the libellants, is necessary, and asked that in such event the answer be amended accordingly.

On the foregoing facts I find the following conclusions of law:

(1) The steamer was wholly in fault for the collision, and the bark was not in fault.

(2) The liability of the respondent in this suit is limited to the value of his interest in the steamer in the condition in which she and the remnants of her were after her stranding and wreck, and he is liable in this suit to ——— for such value, which on the present proof is the sum of $1,796.14, and for nothing more.

SAMUEL BLATCHFORD, Circuit Justice.

BLATCHFORD, Justice. That the steam-ship was wholly in fault in the collision, and responsible for the damages caused to the bark, and that the bark was free from fault, and that the liability of the respondent, unless limited, follows that of the vessel, are propositions entirely clear and not contested.

The respondent contends that he is entitled to the benefit of the limitation of liability provided for by the statutes of the United States. The provisions on the subject in force at the time of this collision are found in sections 4282 to 4285 of the Revised Statutes, which are as follows:

"Sec. 4282. No owner of any vessel shall be liable to answer for, or make good to any person, any loss or damage which may happen to any merchandise whatsoever which shall be shipped, taken in, or put on board any such vessel by reason or by means of any fire happening to or on board the vessel, unless such fire is caused by the design or neglect of such owner.

"Sec. 4283. The liability of the owner of any vessel for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing lost, damage or forfeiture done, occasioned, or incurred without the privity or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

"Sec. 4284. Whenever any such embezzlement, loss, or destruction is suffered by several freighters or owners of goods, wares, merchandise, or any property whatever on the same voyage, and the whole value of the vessel and her freight for the voyage is not sufficient to make compensation to each of them, they shall receive compensation from the owner of the vessel in proportion to their respective losses; and for that purpose the freighters and owners of the property and the owner of the vessel, or any of them, may take the appropriate proceedings in any court for the purpose of apportioning the sum for which the owner of the vessel may be liable among the parties entitled thereto.

"Sec. 4285. It shall be deemed a sufficient compliance on the part of such owner with the requirements of this title relating to his liability for any embezzlement, loss, or destruction of any property, goods, or merchandise, if he shall transfer his interest in such vessel and freight for the benefit of such claimants to a trustee to be appointed by any court of competent jurisdiction to act as such trustee for the person who may prove to be legally entitled thereto, from and after which transfer all claims and proceedings against the owner shall cease."

Sections 4282 to 4285 of the Revised Statutes are re-enactments of sections 1, 3, and 4 of the act of March 3, 1851, (9 U. S. St. at Large, 635, 636,) which sections were as follows:

"Section 1. No owner or owners of any ship or vessel shall be subject or liable to answer for, or make good to any one or more person or persons, any loss or damage which may happen to any goods or merchandise whatsoever which shall be shipped, taken in, or put on board any such ship or vessel by reason or by means of any fire happening to or on board the said ship or vessel, unless such fire is caused by the design or neglect of such owner or owners: provided, that nothing in this act contained shall prevent the parties from making such contract as they please extending or limiting the liability of ship-owners.

"Sec. 3. The liability of the owner or owners of any ship or vessel for any embezzlement, loss, or destruction by the master, officers, mariners, passengers, or any other person or persons, of any property, goods, or merchandise shipped or put on board of such ship or vessel, or for any loss, damage, or injury by collision, or for any act, matter or thing, loss, damage or forfeiture done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner or owners respectively in such ship or vessel, and her freight then pending.

"Sec. 4. If any such embezzlement, loss, or destruction shall be suffered by several freighters or owners of goods, wares, or merchandise, or any property whatever, on the same voyage, and the whole value of the ship or vessel and her freight for the voyage shall not be sufficient to make compensation to each of them, they shall receive compensation from the owner or owners of the ship or vessel in proportion to their respective losses; and for that purpose the said freighters and owners of the property, and the owner or owners of the ship or vessel, or any of them, may take the appropriate proceedings in any court for the purpose of apportioning the sum for which the owner or owners of the ship or vessel may be liable among the parties entitled thereto; and it shall be deemed a sufficient compliance with the requirements of this act on the part of such owner or owners, if he or they shall transfer his or their interest in such vessel or freight for the benefit of such claimants to a trustee to be appointed by any court of competent jurisdiction to act as such trustee for the person or persons who may prove to be legally entitled thereto, from and after which transfer all claims and proceedings against the owner or owners shall cease."

The case of *Nat. Steam Nav. Co.* v. *Dyer,* (the case of *The Scotland,*) decided by the supreme court March 20, 1882, 4 Morr. Trans. 277, is authority for the following points:

(1) The act of 1851 applies to owners of foreign as well as domestic vessels, and to cases of collision on the high seas as well as in the waters of the United States, except when the collision occurs between two vessels of the same foreign nation, and it is shown what the law of that nation is, or, perhaps, of two foreign nations having the same maritime laws, and it is shown what that law is.

(2) The maritime law of the United States, as found in the act of 1837, is the same as the maritime law of Europe, and is different from that of Great Britain in this that the former gauges the liability by the value of the guilty

ship and her freight after the loss or injury caused by the collision, and the latter by their value before such loss or injury, not exceeding £15 per ton.

(3) The maritime law is only so far operative as law in any country as it is adopted by the laws and usages of that country.

(4) The courts of every country will administer justice according to its laws unless a different law be shown to apply; and such rule applies to transactions on the high seas; so that when a collision occurs on the high seas between two vessels, controversies arising therefrom will be governed in the courts of this country by our laws, unless the two colliding vessels belong to the same country, or, perhaps, to different countries using the same law. when they will be governed by such foreign law if it be proved.

(5) Ship-owners may avail themselves of the defence of limited liability by answer or plea, as well as by the power of proceeding prescribed by the rules promulgated by the supreme court on the subject; at least, so far as to obtain protection against the libellants in a suit in admiralty to recover for the damages caused by the collision.

(6) If the ship-owners plead the statute in such suit a decree may be made in it requiring them to pay into court the limited amount for which they are liable, and distributing the said amount *pro rata* among the libellants, such proceedings being an " appropriate" proceeding under the statute.

(7) It is not necessary that the owners of the guilty vessel should surrender and transfer her in order to claim the benefit of the statute, but they may plead their unanimity in such suit, and, if found in fault, may abide a decree against them for the value of such vessel and freight, as found by the proofs.

The answer in this case alleges that if the claim of the libellants for damages shall be established against the respondent, the liability of the respondent therefor "is limited to the amount or value of his interest in the said steamer Great Western, and her freight upon the voyage during which such collision occurred, and this respondent's said interest in said steamer and freight is of no value whatever." The answer was sworn to and filed November 25, 1876. The collision occurred March 25, 1876. The answer does not set up that the steamer was stranded or suffered any injury on her voyage after the collision before reaching New York. Still, the allegation in the answer, as to the limitation of the liability of the respondent, must be held to be adequate to allow him the benefit of such limitation of liability as the statutes of the United States afford to him. The allegation that his interest is of no value may be regarded as surplusage, leaving open the question as to what is the amount or value of his interest for which he is to be held liable.

The bark was a Norwegian vessel and the steamer was a British vessel, and no law of either country is proved as a fact. Therefore the case must be governed by the provisions of the statute of the United States.

The respondent contends that his liability cannot exceed the sum of $1,796.14, as being the value of his interest in the steamer and her freight at the end of her voyage, after her loss by stranding. The question as to the proper rule in a case like the present has not been decided by the supreme court, no such case having been before it.

In *Norwich Co.* v. *Wright,* 13 Wall. 104, the offending steamer, the City of Norwich, was so injured by the collision that she took fire as a direct consequence of such injury and was so burned that she sank. In that case the supreme court said: "By the maritime law, the liability of the ship-owner was limited to his interest in the ship and freight for all torts of the master and seamen, whether by collisions or anything else, and sometimes even for the master's contracts; and his liability was so strictly limited that he was discharged by giving up that interest, or by the vessel being lost on the voyage." The court then went on to hold that the act of 1851 covered a limitation of liability in case of injury to another vessel or her cargo by collision. It then proceeded to say that the act of 1851 contained a provision whereby the ship-owner could discharge himself, as in the maritime law, by giving up the vessel and her freight; that such a provision was not found in the statutes of Great Britain, Massachusetts, or Maine, and could not have been inserted without direct reference to the like provision of the maritime codes; and that the act of 1857 intended to adopt the rule of the maritime law on the subject, so far as relates to torts. This was a decision that the owner of the steamer could avail himself of the benefits of the act of 1857 by surrendering the steamer, and any freight that might have accrued, without paying what was the value of the steamer before the collision, and the value of the freight for the voyage.

In the case of *In re The Norwich,* 17 Blatchf. C. C. 221, the owner of the steamer, the City of Norwich, petitioned for a limitation of its liability growing out of said collision. It was found by the court that within half an hour after the collision the boat took fire and was so burned that she sank in about 20 fathoms of water, and that the fire was a direct consequence of the collision, and inseparable from it. The court (Mr. Justice Strong) said:

"The limit of liability prescribed by the act of congress is that it shall in no case exceed the amount or value of the interest of the owner or owners in the offending ship or vessel, and her freight then pending. This presents the question: At what point of time is the value of the owner's interest to be taken? Is the measure of the owner's liability or its maximum the value of

the ship and her freight before the injury was done? or the value at some time subsequent to the injury, when proceedings may be instituted to ascertain its amount? or is it the value immediately after the fault has been committed; as, for example, in a case of collision immediately following the collision caused by it?"

The court then held that by the maritime law all that the sufferers by the misconduct of an offending vessel were entitled to was the vessel itself after the injury had been committed, together with her freight; that that was the measure of the liability adopted by the act of 1851; that the owners of the steam-boat were not liable to the extent of the value of the steam-boat immediately before the collision; and that such was the decision in 13 Wall. 104. The steam-boat had been raised and repaired, and had become of the value of $70,000, before the petition for a limitation of liability was presented. It was urged that that value must be taken as the measure of the owner's liability. As to this the court said:

"To hold that the owners are liable to the extent of that valuation would be substantially to require them to surrender not only the ship and her freight, but also a sum of money equal to all they expended upon her in raising and repairs. Such, I think, would be a departure from the obvious meaning of the statute, and not required by the maritime law. *  *  * I cannot doubt that the measure of liability recognized by the maritime law, and by the act of congress, is the value of the offending ship in the condition in which she was immediately after the disaster, adding the freight. Then the claims of the persons injured arose, the claims which the statute limits. The extent of the limitation is not a shifting one, varying with the times when the protection of the act may be sought, any more than it can be enlarged or diminished by the choice of the mode of obtaining that protection. Certain it is that if, immediately after the collision, the steam-boat owners had surrendered the vessel and freight, or transferred them to a trustee, they would have been discharged. Her value and her freight then pending were then all that they were liable for. That was then the extent of their loss. I cannot see that their liability can be increased by anything that may have occurred thereafter. It is the vessel, as she then was, that could have been transferred in satisfaction of all claims, if the owners had elected that mode of obtaining their discharge. And it is the value as it then was, which is the equivalent of the vessel, that might, then, have been paid in pursuance of an apportionment made by the court. Had the vessel proceeded on her voyage after the collision, and had she met with another disaster, occasioned by the fault of the master, by which her value had been greatly reduced, could she then have been surrendered or transferred in full satisfaction of the claims against her, or her owners, arising out of her first fault? Would her value, after the second disaster, have been the measure of the owner's liability? I cannot think such a position can be maintained. Surely, such is not the spirit of the statute. And, if not, it seems equally plain that the

liability of the owner is not enlarged by the fact that, after the collision, the boat has been raised and repaired by them at large expense, or, in other words, has increased in value. * * * The liability of the owner is discharged either by transferring the vessel and freight, or by paying their equivalent; that is, the value of what they might have transferred in discharge, according to the apportionment of the court. The owners have their option of these two modes. They may give up the vessel and freight, or they may retain them and pay their value. But the measure or limit of liability in each case is the same. Very plainly, it is not intended that the creditors shall obtain more when one mode of proceeding is adopted than when the other is followed. But, as I have said, all that the owners are required to transfer is the ship in her damaged condition, as she was immediately after the injury was inflicted. Equivalent to that, is her value at that time."

The court held that the value of the boat immediately after the collision and fire, as she then was, lying at the bottom, which value was $2,200, together with her pending freight, was the extreme measure of the owner's liability and was the amount to be apportioned. There was $600 of pending freight, but as it was wholly lost, and not earned, it was held to have been of no value immediately after the collision, and the owner was held not to be liable for it.

In *The Benefactor*, 103 U. S. 239, 246, the court said:

"The counsel for the appellees is mistaken is supposing that the value of the offending vessel at the time of the collision furnishes the only criterion of the amount for which her owners are liable. In *Norwich Co.* v. *Wright*, 13 Wall. 104, we held that the owners of the offending vessel could, under the statute, discharge themselves from personal liability by surrendering the ship and freight. This would imply that the value of the ship at the time of surrender, with the addition of the pending freight, if the surrender is made in a reasonable time, would furnish a proper criterion of the amount of liability. In the case cited it was also said (p. 124) that 'if the vessel were libeled and either sold or appraised, and her value deposited in court, this sum, together with the amount of the freight, (when proper to be added,) would constitute the *res* or fund for distribution. In England, the value of the vessel immediately before the collision was regarded as the true criterion of liability. But the English law is different from ours. It makes the owners liable to the extent of the value of the ship at the time of the injury, even though the ship itself be lost or destroyed at the same time; whereas our law, following the admiralty rule, limits the liability to the value of the ship and freight after the injury has occurred, so that if the ship is destroyed the liability is gone; and, whether damaged or not damaged, the owners may surrender her in discharge of their liability. What may be the rule if, after the collision have occurred, the offending vessel should meet with other disasters, greatly impairing her value, is a question which may require further consideration when the case arises. Nothing of the kind is alleged in the present case."

In *Nat. Steam Nav. Co.* v. *Dyer*, 4 Morr. Trans. 277, the court said:

"In the case of *Norwich Co.* v. *Wright*, 13 Wall. 116, we had occasion to state that the general maritime law of Europe only charges innocent owners to the extent of their interest in the ship for the acts of the master and crew, and that if the ship is lost their liability is at an end. * * * But while this is the rule of the general maritime law of Europe, it was not received as law in England nor in this country until made so by statute. The English statutes, indeed, have not yet adopted to its full extent the maritime law on this subject. They make the owners responsible to the value of the ship and freight at the time of the injury,—that is, immediately before the injury,— although the ship be destroyed or injured by the same act, or afterwards in the same voyage, while our law adopts the maritime rule of graduating the liability by the value of the ship after the injury as she comes back into port and the freight actually earned, and enables the owners to avoid all responsibility by giving up the ship and freight if still in existence, in whatever condition the ship may be, and without such surrender subjects them only to a responsibility equivalent to the value of the ship and freight as rescued from the disaster. But while the rule adopted by congress is the same as the rule of the general maritime law, its efficacy as a rule depends upon the statute, and not upon any inherent force of the maritime law. * * * Therefore, while it is now a part of our maritime law, it is, nevertheless, statute law, and must be interpreted and administered as such. In that case the Scotland, the offending steamer, suffered so severely from the collision that she sank and was totally lost before she completed the voyage she was on at the time of the collision, and only some strippings were saved from her."

The question to be determined in the present case is whether the respondent is freed from the liability he would have been under if the steamer, uninjured by the collision, had safely reached New York, by reason of the fact that she, after such collision, was herself lost during the same voyage from a cause not growing out of such collision.

An examination of section 4283 shows that the limitation of liability is applied to three distinct cases: (1) Loss of property shipped on the vessel; or (2) damage by collision to other vessels and their cargoes; or (3) any other damage or forfeiture done or incurred. Each is independent of the other. The occurrence of any one is sufficient ground for a limitation. The liability exists to the extent not affected by the limitation, and exists because of the happening of the event, the character of which is such that the liability is made to cease when it reaches such extent. The liability in each case comes into existence by the happening of the event, and goes on until it reaches in each case the amount or value of the interest of the owner in the vessel, if that is not greater than the loss or damage. If section 4283 stood alone, it might be said that it intended to give the value of the

interest in each case as it stands immediately after the incurring of the liability, as soon as all direct effect of the event creating the liability upon the physical condition of the vessel has been suffered by the vessel. But no such view can be maintained when the provisions of sections 4284 and 4285 are considered in connection with those of 4283. By section 4284, whenever any loss is suffered by several owners of property on the same voyage, and the whole value of the vessel and her freight for the voyage is not sufficient to make compensation to each, they are to receive compensation from the ship-owner in proportion to their respective losses. The whole value of the vessel and her freight is to be applied to all the losses named in section 4283, though there may be a loss of each of two or of all of said three kinds on the same voyage. Thus there may be the loss or destruction of the property shipped on the vessel, creating at the time a liability, and afterwards on the same voyage she may negligently collide with and damage another vessel, creating thereby another liability. There is, then, under section 4284, a loss suffered by several owners of property on the same voyage. If the value of the vessel and her freight for the voyage is not sufficient to compensate each owner,—that is, all the owners suffering loss,—the ship-owner is with such value to compensate all in proportion to their respective losses. After the happening of the event which caused the loss or destruction of the property shipped, which may have been an explosion or a leakage of liquids, the vessel may have been left of sufficient value to compensate fully for such loss or destruction, but she may have been so damaged by the collision as to make her value as left inadequate to compensate fully for the loss of the property shipped, and also for the damage caused to the other vessel by the collision. In such case the owner of the property shipped cannot claim full compensation. His loss must be put in with the other losses on the voyage, and he must be satisfied with his *pro rata* share of the value of the vessel and freight. The statute is express in section 4284 in including all losses on a voyage. What the losses are cannot be told till the voyage is fully ended. The "whole value of the vessel" mentioned in section 4284 means her value at the close of the voyage. If there be two or more losses during the voyage, for which the ship-owner is liable, and the vessel, after the accruing of the liabilities and during the same voyage, is lost herself, the clear meaning of the statute is that no one shall receive compensation for his whole loss. No different rule can be applied under the statute where the offending vessel is lost after the accruing of one liability, and only one claim for loss is

made by one owner of the property lost. The proceedings for apportionment provided for by section 4284 may be taken where there is but one claim made, and the value of the vessel and her freight is not sufficient to make compensation fully for such claim. This is provided for by rule 54 in admiralty.

These views are supported by the provisions of section 4285, under which the ship-owner may make the required compensation and discharge his liability by transferring his interest in the vessel and freight to a trustee to be appointed by a court. This he cannot do till an opportuntity is given to do so. When he does it, the interest to be transferred is the interest as it stands at the time of the transfer, if that is made in a reasonable time, and nothing has intervened amounting to a waiver or forfeiture of the right to make the transfer. These views are in accordance with what has been held to be the general principle of the statute of the United States, namely, an adoption of the maritime law of Europe in respect to a limitation of liability for torts of the master and crew.

It is declared in *Norwich Co.* v. *Wright* that by the maritime law the ship-owner was discharged by the loss of the vessel on the voyage, or by giving up what was left of her after a disaster to her on the vogage.

Again, in *Nat. Steam Nav. Co.* v. *Dyer*, the rule of the maritime law is stated to have been only to charge innocent owners to the extent of their interest in the ship for the acts of the master and crew, and to regard their liability as at an end if the ship was lost, and it is there said that our statute adopts such maritime rules. The reservation made in the case of *The Benefactor*, that a question like that in the present case may require further consideration when it arises, must be accepted as only an expression of that proper judicial caution which leaves open in form, questions that are not *sub judice.*

No effect can arise from the fact that the Great Western was stranded by the negligence of her master and crew. The collision with and sinking of the bark were caused by the negligence of the master and crew of the steamer; yet the ship-owner's liability is subject to limitation. If the subsequent loss of the offending vessel destroys his liability, it must do so whether the loss be caused by the negligence of the master and crew, or by a peril of the sea without such negligence. The general principle of the maritime law and of our statute is that the ship-owner·exposes to loss, resulting from the faults or neglects of the master and crew to whose care he intrusts his vessel, only the property intrusted to them, and can free himself from

liability for such faults or neglects by surrendering such property in the shape in which it comes back to him from their hands, so long as no privity or knowledge on his part attaches to any such fault or neglect, or to any disaster which has befallen the vessel during the voyage. In accordance with this principle the statute allows an opportunity for such surrender. It could not be made in this case between the time of the collision and the time of the stranding. The risk of the loss of the offending vessel is thrown, for the benefit of commerce, on the owner of the property damaged by her, so that if she is lost in the sea her value shall not again be lost to her owner.

Attention is directed by the libellants to the fact that the cases of *The City of Norwich* and *The Scotland* arose under the act of 1851, while the present case arose under the Revised Statutes, and to certain differences of language between the two enactments. In section 3 of the act of 1851 it is said that the liability of the "owner or owners" shall not exceed the amount or value of the interest of "such owner or owners respectively" in the vessel. In section 4283 of the Revised Statutes it is said that the liability of "the owner" shall not exceed the amount or value of the interest of "such owner" in the vessel. In section 4 of the act of 1851 it is said that "such owner or owners" may transfer "his or their interests." In section 4285 it is said that "such owner" may transfer "his interest." On these differences of language it is contended that the Revised Statutes exclude a limitation of the liability of a part owner to the value of his interest in the vessel and freight, and do not provide any limitation short of the interest of the owner or owners collectively in the whole vessel. There is no force in this contention. By section 1 of the Revised Statutes it is provided that in determining the meaning of the Revised Statutes words importing the singular number may extend and be applied to several persons or things, and words importing the plural number may include the singular. It was undoubtedly because of this general provision that the language of the act of 1851 was condensed in the Revision. Read by the light of such general provision, and in view of the principles on which the Revision was made, it must be held that the new language in sections 4283 and 4285 is the result merely of revision, simplification, rearrangement, and consolidation, with a view to the re-enactment of the same substance and meaning. *Murdoch* v. *City of Memphis*, 20 Wall. 590, 617; *Smith* v. *Fisk*, 23 Wall. 374; *U. S.* v. *Claflin*, 14 Blatchf. C. C. 55; *The L. W. Eaton*, 9 Ben. 289, 298–303. The above re-

marks apply also to the suggestion on the part of libellants, that section 4285 differs from section 4 of the act of 1851 in that it limits the operation of an abandonment to a discharge of the ship-owner's liability arising from the particular disaster in respect of which the abandonment is authorized, while under section 4 of the act of 1851 a transfer had the effect to discharge the ship-owner from liability for all torts of the master during the voyage.

It follows from these considerations that the respondent is entitled to have his liability to the libellant limited to the value of his interest in the steamer as such interest existed after she was stranded and wrecked, with the addition of her pending freight. But the respondent contends that under section 4285 the libel must be dismissed because he has made the transfer provided for by making the transfer to the libellants dated April 19, 1877. Under the statute, the transfer, to be effective, must be a transfer of an existing interest in the transferrer, and he must not before have transferred his interest voluntarily to some other person. By the abandonment to the underwriters, and the subsequent sale of the wreck and of the materials saved therefrom for account of the underwriters, and pursuant to directions from the owners before any transfer to the libellants was made, such right of transfer was lost, and the attempted transfer was nugatory. The abandonment to the underwriters transferred to them the property. Whether, under the maritime law, there could or could not have been a surrender after an abandonment to underwriters, it is plain that our statute requires a transfer which will carry title, so that under rule 55 in admiralty the transferee may realize the proceeds for the benefit of the person or persons entitled to damages.

It is contended by the libellants that the transfer which did not include the insurance money could be effective in this case, and that the amount for which the respondent is to be held liable must include such insurance money. On the other hand, the respondent contends that the libellants have no interest in such money.

In *Norwich Co.* v. *Wright*, 13 Wall. 117, a remark of Pardessus (Droit Comm. part 3, tit. 2, *c.* 3, § 2) is quoted as follows: "The owner is bound civilly for all delinquencies committed by the captain within the scope of his authority, but he may discharge himself therefrom by abandoning the ship and freight, and if they are lost it suffices for his discharge to surrender all claims in respect to the ship and its freight." The court adds, "such as insurance," etc. On the basis of this remark it is recited in *Dyer* v. *Nat. Steam Nav. Co.* 14 Blatchf.

C. C. 483, 487, as the rule of the maritime law, that if vessel and freight were lost the ship-owner could not discharge himself "without surrendering all claims in respect of vessel and freight, such as insurance," etc. When the case of *The City of Norwich* came before this court on the petition of her owner for a limitation of liability, (17 Blatchf. C. C. 221,) it appeared that at the time of the collision she was insured against fire, not against marine disaster, and that her owner had received from the underwriters, as insurance money, some $49,000. The question arose whether it should account for that money to the claimants for loss and damage by the collision, in addition to the value of the steam-boat as she lay sunk after the collision and the fire. The court held that under the statute the liability extends only to what would pass to a trustee, and what was required to be transferred as a condition of discharge was only the interest in the vessel and freight; that nothing was said about transferring insurance; that a transfer of property insured does not transfer insurance; and that a policy of insurance is no interest in the thing insured. The court also examined the authorities and concluded that the maritime measure of liability did not extend to insurance upon the vessel, and that there is nothing in our statute to enlarge such measure of liability. I think it is sufficient to rest the question on the plain language of the statute. The "interest" in the vessel which is the measure of the liability under section 4283, and a transfer of which, if made under section 4285, operates to discharge the claim for loss or damage, does not extend to what is not an interest in the vessel. It was easy for the statute to have provided for liability for transfer of claims for insurance. It fails to do so, whether the maritime law did so or not.

The question as to the value of the steamer and her pending freight after her wreck seems, in the evidence, to have been gone into to an extent sufficient to show, on the evidence as it stands, that such net value was only $1,796.14. But the libellants are at liberty, before a decree is entered on this decision, to apply to this court, on notice, on special cause to be shown by affidavit, for an order of reference to a commissioner to assess such value on the present evidence and on further proofs.

The amount decreed against the respondent by the district court was $17,023.44 damages, with interest on $14,371.44 from May 6, 1876, as an average date, to the date of the decree, and $762.62 costs.

The respondent alone has appealed. He is entitled to his costs in

this court. As he contested the question of fault and negligence, in the district court, by his answer, he is not entitled to costs in that court, but the libellants are entitled to costs in that court.

See 9 Ben. —