## THE GREAT WESTERN.

## THOMMESSEN & Another *v.* WHITWILL.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF NEW YORK.

Argued October 19, 20, 1885.—Decided May 10, 1886.

The decision in *The City of Norwich*, ante 468, in relation to the time when the value of the owner's interest in the ship is to be taken for fixing the amount of his liability, applied to a case where the offending ship did not sink in consequence of the collision, but was afterwards sunk and wrecked in the same voyage by the negligent navigation of those in charge of her; this sinking being held to be the termination of the voyage.

The decision in the same case as to insurance repeated.

Limited liability may be claimed, 1st, merely by way of defence to an action ; or, 2d, by surrendering the ship or paying her value into court. The latter method is only necessary when the shipowner desires to bring all the creditors claiming damage into concourse for distribution.

The case is stated in the opinion of the court.

*Mr. C. Van Santvoord, Mr. Harrington Putnam, Mr. Henry T. Wing* and *Mr. James K. Hill* for appellants, cited, in addto the authorities cited in the brief filed by *Mr. Putnam* and *Mr. Hill* in *The Scotland, ante,* 514 the following : 1 Parson's Adm. and Mar. Law, ed. 1869, 525 ; *The Scioto,* 2 Ware, 359 ; *The Woodrop Simms,* 2 Dodson, 83 ; *Reeves* v. *Ship Constitution,* Gilpin, 579 ; *Wilson* v. *Dickson,* 2 B. & Ald. 2 ; *Cannan* v. *Meaburn,* 1 Bing. 465 ; *The Benares,* 7 Notes of Cases, 538 ; *The Benefactor,* 103 U. S. 239 ; *Norwich Co.* v. *Wright,* 13 Wall. 104 ; *United States* v. *Claflin,* 97 U. S. 546 ; *Butler* v. *Russell,* 3 Cliff. 251 ; *Heckman* v. *Pinkney,* 81 N. Y. 211 ; *People* v. *Gold Stock & Tel. Co.* 98 N. Y. 76.

*Mr. James Thomson* (*Mr. E. C. Henderson* was with him on the brief) for appellee, cited *The Scotland,* 105 U. S. 24 ; *The Phebe,* 1 Ware, 265 ; *Norwich Co.* v. *Wright,* 13 Wall. 104 ; *The Rebecca,* 1 Ware, 187 ; *Wattson* v. *Marks,* 2 Am. Law Reg. 157 ; *Petition Norwich & N. Y. Trans. Co.,* 17 Blatchford, 221 ; *S. C.* 8 Ben. 312 ; *Walker* v. *Boston Ins. Co.,* 14 Gray, 288 ; *Lynch* v. *Dalzell,* 4 Bro. P. C. 431 ; *Sadlers Co.* v. *Badcock,* 2 Atk. 544 ; Pothier, Traité d'Assurance, C. 1, §§ 1, 2, pl. 10, 11. *Dalby* v. *India & London Life Assn. Co.* 15 C. B. 365 ; *Columbian Ins. Co.* v. *Lawrence,* 10 Pet. 512 ; *Carpenter* v. *Prov. Wash. Ins. Co.* 16 Pet. 496 ; *Prov. & N. Y. Steamship Co.,* v. *Hill Mfg. Co.,* 109 U. S. 578 ; *The C. H. Foster,* 1 Fed. Rep. 733 ; *In re Long Island & Trans. Co.,* 5 Fed. Rep., 599 ; *The Benefactor,* 103 U. S. 239 ; *Ex parte Slayton,* 105 U. S. 450.

On the question of the origin and construction of the statute of 1851, Mr. Thomson urged the following further considerations :

English legislation on this subject prior to the act of 1851, was embraced in the three statutes, 7 Geo. II. ch. 15, 26 Geo.

III. ch. 86, and 53 Geo. III. ch. 159; and its history has been related in *Norwich Co.* v. *Wright*, 13 Wall. 104, in *Walker* v. *Ins. Co.*, 14 Gray, 288, and by Mr. Lathrop, in his article in 1 Am. Law Rev., 598.

The limit of liability prescribed by all these acts, whether in the case of a part owner or of an owner of the whole ship, is the same, the value of the vessel and freight. The phrase, interest of the owner in vessel and freight, does not appear, because it would have no application.

The act of 1851 was principally drawn from the Act 26 Geo. II., ch. 86, and from either the Revised Statutes of Maine, Revision 1840, ch. 47, § 8, *et seq.*, or the Revised Statutes of Massachusetts, Revision 1836, ch. 32, § 1, *et seq.;* probably the former, since there are verbal agreements which point to this conclusion, and Mr. Hamlin, of Maine, took charge of the bill in the Senate.

Section 8 of chapter 40 of the Revised Statutes of Maine, which was apparently the source of the third section of the act of 1851, is as follows:

"§ 8. No shipowner shall be answerable beyond the amount of his interest in the ship and freight for any embezzlement, loss or destruction by the master or mariners, of any goods or merchandise, or any property put on board of such ship or vessel, or for any act, matter or thing, damage or forfeiture done, occasioned or incurred by said master or mariners, without the privity or knowledge of such owners."

This is substantially the provision of the Revised Statutes of Massachusetts, Revision 1836, ch. 32, § 1, and the phrase, " interest in the ship and freight," in both revisions, is taken from the act of Massachusetts, Laws 1819, ch. 122, which constituted the earliest legislation in the United States on this subject, and was almost literally copied in the Maine statute, Laws 1821, ch. 14, the phrase, of course, on well settled principles, retaining in the revisions the meaning which it had in the statutes revised. Bishop on Written Laws, §§ 98, 144; *United States* v. *Bowen*, 100 U. S. 568, p. 573.

The material provisions of the Massachusetts act were as follows:

Opinion of the Court.

"§ 1. Be it enacted, &c., that from and after the passing of this act, no person or persons who is, are or shall be owner or owners in part or in whole of any ship or vessel, shall be subject to answer for, or make good to any one or more person or persons any loss or damage by reason of any embezzlement, secreting or making away with, by the master or mariners, or any of them, of any goods, wares or merchandise, or any property whatsoever, which shall be shipped, taken or put on board any ship or vessel, or for any matter or thing, damage, or forfeiture, done, occasioned or incurred by the said master or mariners or any of them, without the privity or knowledge of such owner or owners, further than the value of the interest which such owner or owners have or had at the time of such shipment in the ship or vessel, with all the appurtenances and the full amount of his interest in the freight due or to grow due for and during the voyage, wherein such embezzlement, secreting or making away with, as aforesaid, or other malversation of the master or mariners shall be made."

That these statutes were based on the 26 Geo. III. ch. 86, is apparent from the narrow scope of the protection afforded; but even a cursory examination shows that the American statutes introduce a different limit of liability in the case of a part owner, and that the construction and object of this phrase in these acts is beyond doubt.

They restrict the gross liability of the owners to the value of the vessel and freight, and the liability of any part owner to the value of his share in the vessel and freight, adopting in this respect no new principle, but the well settled rule, amongst others, of the Consolato del Mare, ch. 141, 182; Holland, Ordinance of Rotterdam, Arts. 126, 127, 167, 2 Magens, 101, 102; and Hamburg; 1 Valin, 569.

Mr. JUSTICE BRADLEY delivered the opinion of the court.

This case grew out of a collision which occurred on the 25th of March, 1876, on the high seas, 150 miles from Sandy Hook, between the Norwegian bark Daphne, belonging to the appellants and bound to Marseilles, and the British steamship Great Western, belonging to the respondent and

others and bound to New York. The Daphne was injured about $7000 worth, and the court below found that the Great Western was in fault, and was worth $150,000, both before and immediately after the collision; but that after the collision, and on the same day, the steamer, while still on her voyage to New York, was stranded and wrecked on the south coast of Long Island by the careless navigation and fault of those in charge of her, and from no cause connected with the collision. No freight was received by her owners. On the 29th of March they abandoned her to the underwriters, and received from them insurance to the amount of £34,000 as for a total loss. After this the wreck and materials saved were sold for account of the underwriters and by direction of the owners, and realized $1796.14. On the 27th of March, 1876, the libel was filed in this case on account of the owners of the Daphne, and Whitwill, the respondent, appeared and answered, denying that the Great Western was in fault, and claiming that if she should be found in fault, the owner's liability was limited to the amount or value of his interest in the vessel and her freight; and that this interest was of no value whatever, and to this he added by leave of the court during the trial, the following words: "And he hereby surrenders the same to the libellants." He also during the trial tendered an assignment of his interest to the libellants, and offered to give another assignment to a trustee for the benefit of the libellants under section 4285 of the Revised Statutes of the United States. The court below held that the owners of the Great Western were only liable for the proceeds of the wreck, amounting to $1796.14, and gave a decree for that amount and interest, and for the costs of the libellants in the District Court.

The errors assigned for the reversal of this decree are substantially as follows, to wit: *First.* That the limitation of the respondent's liability to the value of the ship and freight in the condition in which they were after the stranding and wreck is contrary to the rule contained in section 4283 of the Revised Statutes. *Secondly.* Because the insurance received by the owners was not included in the value of their interest in the

ship, liable to be surrendered in order to obtain a limitation of liability, and was not taken into account in fixing the measure of such liability. *Thirdly.* Because the court allowed the respondent to amend his answer by adding the words "and he hereby surrenders the same to the libellants;" and permitted him to give in evidence his written surrender of his interest in the steamer to the libellants; and his offer to make a like surrender to a trustee for the benefit of the defendants. *Fourthly.* Because, without proof that the laws of Sweden and Great Britain are the same on the subject, the only law applicable to the case was the law of the forum, of which the general admiralty law forms no part.

The points raised in the first and second assignments have been already discussed and decided in the case of *The City of Norwich, ante,* 468. There is nothing peculiar in the present case, unless it be that the Great Western was not sunk or wrecked by means of the collision, but afterwards, by the carelessness of her master or crew. This can make no difference. We showed in the opinion referred to that the termination of the voyage is the point of time at which the value of the offending vessel is to be taken. The voyage in the present case was not terminated until the vessel was sunk and stranded on the Long Island coast. The carelessness of the master and crew cannot vary the result. It is against their faults and negligence that the law was intended to protect the shipowner, provided the loss and damage sustained were caused without his privity or knowledge.

The third assignment of error cannot be maintained, because the evidence referred to therein, which the court allowed to be given on the trial, could not affect the result; nor was the amendment of the answer material. The answer, as originally framed, set up the defence that the liability of the respondent was limited to the amount or value of his interest in the Great Western and her freight upon the voyage, and averred that that interest was of no value. The issue being thus raised, the respondent was entitled to have the decree against him in that cause limited to the amount which should be shown, by the proofs on the trial, to be the value of said steamer and

freight at the termination of the voyage. He did not need to make any surrender or attempt at a surrender. A surrender of the vessel, or payment of her proceeds, or value, into court would have been necessary in order to bring other creditors into concourse with the libellants; but for the mere defence of that cause it was not necessary. This disposes of the supposed difficulty in making an abandonment to the libellants after a surrender or abandonment to the insurers; a difficulty which we have already shown to be groundless in the opinion referred to.

The fourth assignment of error is not well taken, because the case was altogether decided according to the maritime law of this country, which is the law of the forum.

The decree of the Circuit Court is

*Affirmed.*

Mr. JUSTICE MATTHEWS, with whom concurred Mr. JUSTICE MILLER, Mr. JUSTICE HARLAN, and Mr. JUSTICE GRAY dissenting.*

Mr. Justice Miller, Mr. Justice Harlan, Mr. Justice Gray, and myself are unable to concur in the opinion and judgment of the court in the three cases just disposed of. The importance of the question decided justifies a statement of the grounds of this dissent.

The principal question, stated generally, involved in all the cases, is, whether under §§ 4282 to 4285, inclusive, of the Revised Statutes, being re-enactments of §§ 1, 3 and 4 of the act of March 3, 1851, limiting the liability of shipowners, so that for the losses specified it shall not in any case exceed the amount or value of the interest of such owner in such vessel and her freight then pending, that value shall be estimated as including or excluding any sum received or receivable by the shipowner on account of insurance upon his interest in the vessel or freight.

Although that is the main question in all the cases now decided, the circumstances which give rise to it in them, respect-

---

* This dissent is also entitled in the case of *The City of Norwich, ante,* 468, and in the case of *The Scotland, ante* 507.

ively, differ in some important particulars, a consideration of which will throw light upon the principle according to which it is to be determined.

The case of *The Scotland* (*Dyer* v. *The National Steam Navigation Co.*) was a libel *in personam*, in a cause of collision, for the loss of the ship Kate Dyer, run down on the high seas by the fault of the steamship Scotland, of which the respondents were owners. A former appeal in the same case decided by this court is found reported under the name of *The Scotland*, 105 U. S. 24. The Kate Dyer was sunk immediately, and the steamship Scotland sunk soon after, from the effects of the collision, and was a total loss, a portion of the wreck being saved. It was held on the former hearing that the respondents were entitled to the benefits of the statute limiting their liability. The decree for the several libellants amounts in the aggregate to $255,047.70. It is also found that the Scotland at the time of the collision was worth £100,000, was insured to the amount of £63,500, and that within nine months after the collision the respondents had received the amount thereof, equal to $299,867.42 ; but that the value of the articles saved from the wreck is the sum of $4927.85, which the decree ascertains to be the amount for which alone the respondents are liable.

The case of *The Great Western* (*Thommessen* v. *Whitwill*) was a cause of collision in which the loss of the bark Daphne was found to be from the fault of the steamship Great Western, of which the respondents were owners, the libel being against them *in personam*. The libellants were domiciled subjects of the Kingdom of Norway and Sweden, and the respondents of Great Britain. The libellants were found to have sustained damages from the injuries to the bark by the collision in the sum of $7023.44, and the value of the steamship, both before and after the collision, until her subsequent stranding, was from $140,000 to $150,000. After the collision, while on the same voyage to New York, the steamship was stranded and wrecked from a cause in no way growing out of or connected with the collision, by the careless navigation and fault of the persons in charge of her. Immediately thereafter, the owners of the steamship made an abandonment of her to various un-

derwriters who had insured her to the amount of £34,000, which was paid by them to the owners as a total loss.   There were saved from the wreck materials which on sale realized to the owners $1796.14.   The decree limited the liability of the respondents to this amount.

The remaining case of *The City of Norwich (Place & Others*, libellants, claimants of the schooner General S. Van Vliet and of the cargo, against *The Norwich & New York Transportation Company)* presents other features.  The collision in this case was caused by the negligence of the steamboat City of Norwich, owned by the appellees.    Immediately after the collision the steamboat took fire, her deck and upper works were burnt off, and she sank in about twenty fathoms of water.   Her cargo of merchandise was thereby totally lost.   The steamboat itself was raised by salvors and taken to the port of New York, where she was repaired.   On May 9, 1866, less than a month after the disaster, William A. Wright and others, owners of the schooner, filed in the District Court for Connecticut a libel *in personam* against the appellees, as owners of the steamboat, and obtained a decree for the loss of the schooner and her cargo for $26,657.28, which on appeal to this court was affirmed, and will be found reported in 13 Wall. 104.   On August 23, 1866, while that suit was pending in Connecticut, and after the steamboat had been raised, repaired, and brought into the port of New York, two of the appellants, George and Charles Place, as owners of part of the cargo on the steamboat, filed their libel *in rem* against her in the District Court of the Eastern District of New York.   Other libels *in rem* by other owners of cargo were also filed.   The steamboat was seized under process in these suits, and the appellees intervened as claimants, an appraisement was ordered, and a stipulation for the appraised value in the sum of $70,000 having been given, the steamboat was released to them.   This appraisement was of the value of the vessel, in her condition at the time, after the repairs had been made.   Decrees were entered in favor of the libellants in all these cases.   In July, 1872, after the final decision by this court in the case of *Norwich and New York Transportation Co.* v. *Wright,* 13 Wall. 104, on appeal from the Circuit Court for the District of

Connecticut, and after the decrees in the District Court for the Eastern District of New York in the proceedings *in rem*, the owners of the steamboat, the present appellees, filed their petition in the last named court, praying for the benefit of the act limiting their liability. Such proceedings were thereupon had that an appraisement was made of the value of the steamboat in the condition and situation in which she was, after the collision and before she was raised, and it was found to be $2500, being the difference between $25,000, her value when raised, and $22,500, the amount expended in raising her. A decree was finally entered in the Circuit Court on appeal, limiting the liability of the appellees to this amount, and it was distributed among the libellants, after refunding to the appellees $1008.41, part thereof, for their costs in the litigation. The decree thereupon also perpetually enjoined all the libellants who had obtained decrees in their favor in the suits *in rem* in the Eastern District of New York from the enforcement of those decrees, and thus deprived them of their right to recover against the stipulators, who had filed a stipulation in the sum of $70,000 to answer the decrees in those causes. So that in these cases the owners are exonerated from all personal liability in excess of the sum of $2500, but have received back their vessel free and discharged from all liens established by the decrees against her *in rem* in the Eastern District of New York. It is also found as a fact, that when the collision occurred the steamboat was insured against fire but not against marine disaster, and of the insurance money the appellees have recovered and received from the underwriters the sum of $49,283.07.

It thus appears that in one case the owners of a vessel, whose fault caused a loss to others of more than $250,000, escape all liability over $5000, having received more insurance than necessary to pay the whole amount of the loss; in another, the owners are repaid the whole value of the vessel in insurance, and are exonerated from a decree against them of over $7000 on payment of less than $2000; and in the other, the owners keep their vessel discharged from all liens, and receive nearly $50,000 of insurance with which to repair and restore her, and relieve themselves of all liability on account of losses, decreed

against them, to the amount of over $26,000, on payment of less than $2000. The question is, whether these results can be justified by a reasonable interpretation of the law limiting the liability of shipowners.

The question is now for the first time decided by this court. None of its previous decisions have expressly or by implication involved it. It is true, however, that in the opinion of the court in *Norwich Company* v. *Wright*, 13 Wall. 104, 117, in stating the rule of the maritime law of the States of Continental Europe, limiting the liability of shipowners to their interest in their ship and its freight, the passage from Pardessus is quoted, Droit Commercial, part 3, tit. 2, ch. 3, § 2, as follows : " The owner is bound civilly for all delinquencies committed by the captain within the scope of his authority, but he may discharge himself therefrom by abandoning the ship and freight ; and, if they are lost, it suffices for his discharge to surrender all claims in respect of the ship and its freight," and it is added by the court, " such as insurance," &c. The court then further said : " The same general doctrine is laid down by many other writers on maritime law. So that it is evident that by this law the owner's liability was coextensive with his interest in the vessel and its freight, and ceased by his abandonment and surrender of these to the parties sustaining loss."

But the question of including insurance in the estimate of the value of the owner's interest in the ship and freight, and whether it followed the surrender of the latter to the parties sustaining loss, was not directly involved, and the expression of an opinion to that effect must be taken to be casual and *obiter dictum* merely. Inasmuch, however, as the act of Congress of 1851, which is the law of the case, may be supposed to have adopted the rule of liability fixed by it, in view of what was believed to be the rule of the general maritime law of Continental Europe, the quotation from Pardessus, and the application of it to the instance of insurance, as an incident which is involved in the surrender of the ship or in the estimate of its value, is not without significance. It is some evidence, indeed, of the very view of the rule of the maritime law which may have been in the contemplation of Congress when it passed the act

of 1851, and proof to that extent of the meaning of that act. And this is rendered more reasonable from the fact that Baron Parke, in *Brown* v. *Wilkinson*, 15 M. & W. 396, seems to have taken the same view as to the foreign maritime law. In that case, he said it was contended by counsel that the effect of the statute 53 Geo. III. ch. 159, § 3, "was to give to British shipping all the protection which the navigation of some foreign States extended to theirs, and this protection goes to the extent of permitting the owners, at the end of the voyage, to give up the vessel in its then state by way of satisfaction to the parties injured, and, if it be lost, the owners are altogether exempt, on abandoning the benefit of insurance, if any, and salvage."

If, now, on a more critical and extended inquiry into the maritime law of the modern States of Continental Europe, it should appear that the opinion of Pardessus, as quoted in the case above cited, was not universally accepted, and that the codes and commentators of various of those states differ in their legislation and interpretation of the general maritime law on the subject, it would not necessarily follow that Congress, in passing the act of 1851, may not have intended to adopt the rule as stated by Pardessus and those who agreed with him, rather than that now insisted on as more generally prevailing.

There was, in fact, a controversy among writers on commercial and maritime law, both in France and Germany, on the point. The opinion of Pardessus coincided with that of Valin, while Émerigon, who was followed by Boulay-Paty and others, maintained the opposite opinion. This controversy was settled for French law by an amendment to Art. 216 of the Code de Commerce, which expressly excluded insurance from the *abandon* of ship and freight, in exoneration of the shipowner from his liability, though the debate seems to be reopened as a consequence of additional legislation by Art. 17 of the law of December 10, 1874, which, in case of loss of the ship through becoming unnavigable or otherwise, allows subrogation in favor of hypothecation creditors. It also appears that the Prussian Code, adopted in 1794, and continued in force until 1862, provided expressly, that, "when the ship has been insured, the right against the insurer must also be ceded to creditors;" and,

applying the principle to the particular case now under consideration, Kaltenborn, in a treatise on the subject, published at Berlin, in 1851, says: "The Roman law, which held the owner absolutely liable with all his property, is nowhere put in practice, and was not current as early as the Middle Ages. Indeed, the Consulate of the Sea, ch. 183, 224, 236, the law of Wisby, reasoning from Arts. 13 and 68, that of the Hanse Towns, reasoning from Art. 2, Title X, render the owners, as a rule, answerable only to the extent of the ship's value; and the modern maritime laws free the owners, by the *abandon* of the ship and their several shares in the vessel, from all further liability for the ship enterprise, particularly for the acts and contracts of the captain. In the ship are included all gains arising during the voyage, as well as the insurance. Should the ship and the freight have perished, it is sufficient for exoneration of the owners if all claims and causes of action having reference to the vessel and freight are abandoned by them." This was the law of Prussia in 1851, when the Act of Congress of that year on the subject was passed, and continued to be so until March 1, 1862, when the Prussian Code was superseded by that of the Germanic Confederation, which omitted any provision on the subject, overruling the proposals of the Prussian delegates to the contrary.

This statement of the contemporary law of modern Continental Europe on the point is condensed from the very able and learned brief in these cases, prepared and submitted by Mr. Harrington Putnam, one of the counsel, who supports it by elaborate extracts and translations from foreign writers on the subject, whose citations have not in any way been questioned or impugned by opposing counsel, and have, therefore, been relied on as accurate. He states the further fact, that, besides Holland, two other countries, Belgium, by a law of June 19, 1855, and Finland, Maritime Code of 1874, Art. 17, have expressly enacted that the insurance shall not be comprised in the shipowner's *abandon* to creditors. The inference is, that there was nothing in the maritime law of Continental Europe in 1851 which justifies the conclusion that Congress must have intended to exclude insurance from the surrender required of the

shipowner to limit his liability, but, on the contrary, the argument is strong, if not convincing, from the examples of European codes, that it would require express language to effect that exclusion, if such was the intention.

But whatever bearing the foreign law may be thought to have upon the meaning of the statute, it is clear that the latter must be interpreted in the light of the antecedent domestic law which it modified and displaced. What that was is not a matter of dispute.

The passage of the act of March 3, 1851, was no doubt due to the decision of this court in the case of *The New Jersey Steam Navigation Co.* v. *Merchants' Bank*, 6 How. 343, where it was held that in admiralty, as at common law, the owners of a steamboat were liable *in personam* for the loss by fire of specie carried by their boat, notwithstanding a contract of exemption, the loss having occurred from want of ordinary care on the part of those engaged in the navigation of the vessel.

Accordingly it was provided, in the first section of the act of March 3, 1851, that owners of vessels should not be liable for losses by fire of goods carried by them, unless such fire was caused by the design or neglect of the owner himself, with a proviso, now omitted from the corresponding § 4282 of the Revised Statutes, that the parties, nevertheless, might extend or limit the liability of shipowners by "making such contract as they please."

A reference to the debates in Congress upon the bill during its progress will show that this was the only provision which excited any comment; and while allusion was made to English legislation on the subject of limiting the liability of shipowners, and to the statutes of Massachusetts and Maine on the same subject, there was no mention whatever made of any supposed rule of general maritime law prevailing on the subject in Continental Europe, and no explanation of the expected operation and effect of the provision fixing the limit of liability at the value of the interest of the owner in the ship and freight, and of the effect of a surrender of the vessel and freight in exonerating the shipowner from any recovery beyond that limit.

In all cases of liability covered by the statute, there were

provided by the existing law of admiralty jurisdiction a remedy against the vessel itself *in rem* when it could be seized, and the alternative remedy *in personam* against the owners. There was no limit to their liability, but, as in other cases of personal liability, all property of the defendants was subject to process in payment of the judgment or decree. The procedure *in rem* has for its object the enforcement of a liability which by the maritime law is a lien upon the vessel, which is a *jus in re*, and is treated as a proprietary right, capable of being realized by judicial process. *Ward* v. *Chamberlain*, 2 Black, 430; *Vandewater* v. *Mills*, 19 How. 82; *The Lottawanna*, 21 Wall. 558. And in cases of torts, as well as in many cases of contract, where the general owner has intrusted a special owner or charterer with authority to bind the ship but not himself, the vessel is treated by the maritime law as an actor and juridical person, capable of committing wrongs, and is pursued as a delinquent without regard to ownership or agency. *The China*, 7 Wall. 53; *Malek Adhel*, 2 How. 210. And when the liability is not only a lien on the vessel, but a claim against the owner personally, if satisfaction is not secured by process *in rem*, the deficiency may be made good by proceedings *in personam*.

The subject-matter of the act of March 3, 1851, was the personal liability of shipowners to answer for the losses specified, and its limitation. It does not deal with the liability of the vessel itself to answer *in rem* for such losses, as it had no occasion to do. For the sole purpose of the act was to limit the personal liability of owners, so that it should not exceed the value of the ship and freight. It left the vessel, therefore, to be proceeded against *in rem* precisely as before, leaving that procedure entirely untouched and unaffected. There is nothing whatever in the statute to forbid parties having suffered from its fault from prosecuting the offending vessel, as a *res*, to the full extent, as previously authorized by the maritime law, and with all the necessary consequences. On the contrary, the act proceeds throughout on the assumption of that right and liability. It only adds, that in cases where the owners are not personally guilty of the alleged wrong, on taking the steps pointed

out in the law, there shall be no recovery against them personally in excess of the value of their interest in the ship and freight. The act only operates as a limitation upon the personal liability of the owners, as distinguished from the liability of the offending vessel itself.

This seems to us very clear ; and yet, in the case of *The City of Norwich*, the libellants have been perpetually enjoined from prosecuting their decrees actually obtained against the steamboat City of Norwich, because the owners have obtained under the statute a release from their personal liability on account of its wrong. It is not to the purpose to say that, in a proceeding against the vessel, its appraisement included the cost of raising and repairs put upon it by the owners, which ought not to have been included ; for that is a question which could only properly have been litigated in the case in which the decree complained of was rendered. Besides, it is difficult to see on what grounds an owner can rightfully complain, who has voluntarily raised his sunken vessel and repaired her, that those having maritime liens upon her seek to enforce them, or how he can claim, as against them, a prior or any lien on his own vessel for raising and repairing her. And we think it is quite plain that it was an error in the decree appealed from to deprive the libellants, who had obtained their decrees against the vessel, from prosecuting them to their legitimate results, when the whole force of the statute authorizing the proceeding is expended in a limitation of the recovery in suits against the owner *in personam*.

It is not to be assumed, however, that, because the proceeding *in rem* remains unaffected by the act of 1851, the personal liability of owners in proceedings against them *in personam* is restricted to the same extent as it would be if the proceeding *in rem* were declared to be the sole remedy. For that would be to declare, that, in all the cases within the purview of the act, when a proceeding *in rem* could be brought against ship or freight, or the proceeds of either, there should be no personal liability of the owner and no proceeding *in personam* against him. But the statute does not proceed upon the idea that, in such cases, the personal liability of the owner is

altogether superseded by the proceeding *in rem*, but only that it is restricted within certain expressed limits, on compliance with certain definite conditions. In all cases the owner must surrender the vessel and its pending freight, or their value; whereas, in many, such as suits for pilotage and for damage by collision, no process *in rem* against freight is given by the 14th and 15th Rules in Admiralty, such as is authorized by the 12th and 13th in suits by material men and for mariners' wages. So that the statute is not to be treated as if it confined the recovery of the party suffering loss strictly to what he might obtain by a proceeding *in rem* against the vessel alone. It, therefore, does not conclude the inquiry to say, that, in a proceeding *in rem* against the vessel, the libellant had no lien which he could follow on any policies of insurance taken out by the owners, or the proceeds of any such when payable or paid. The question still recurs, what does the statute of Congress require the owner to give up or account for, as a condition of his release from personal liability for the loss and wrong suffered by the libellant?

For the same reason, it is irrelevant and immaterial to say that the policy of insurance, taken out by the owner on his interest in the ship or freight, is a contract of personal indemnity, collateral to his ownership, which does not pass by operation of law with a transfer of the title to the thing which is the subject of the insurance, and to the benefit of which those having liens on the thing are not entitled, in case of its loss, on the principle of subrogation. All that may be true; but, if it is, it nevertheless remains to ascertain whether, recognizing the owner's independent right to recover for his own use insurance accruing to him by the loss of its subject, the statute has not said that he shall not have the privilege of release and exoneration from his personal liability for injuries inflicted by his agents and representatives, except upon the condition, as a price for its purchase, that he shall voluntarily surrender, as the value of his interest in the vessel and freight, whatever they have procured for him of pecuniary advantage, including the insurance money recoverable for their loss.

The language of the statute, Rev. Stat. § 4283, is, that "the

liability of the owner of any vessel," &c., in the cases described, " shall in no case exceed the amount or value of the interest of such owner in such vessel and her freight then pending." By § 4285 it is enacted that "it shall be deemed a sufficient compliance, on the part of such owner, with the requirements of this title . . . if he shall transfer his interest in such vessel and freight, for the benefit of such claimants, to a trustee," . . . " from and after which transfer all claims and proceedings against the owner shall cease." It was decided in the case of *The Scotland*, 105 U. S. 24, that it is not necessary that shipowners should surrender and transfer the ship in order to entitle them to the benefit of the law. That is only one mode of relief. In the alternative, they may retain their interest in the ship, abiding a decree for the value of the ship and freight as ascertained by the court upon the proofs. But this double method of executing the purpose of the statute does not imply any difference in the estimated amount of the possible recovery. The limit of that, in every case, is the value of the owner's interest in the ship and freight, and is the same, whether he makes an actual transfer, or whether he submits himself personally to the payment of the ascertained amount.

The question, then, upon the statute is reduced to this: Whether the insurance money payable or paid to the owner in case of the loss of or damage to the ship is to be included in the estimate of the value of the owner's interest in it. And that question turns, as we think, on another and a very simple one: Whether the value of the owner's interest in his lost or damaged ship, in the sense of the statute, means its money value to him, computed with reference to every pecuniary advantage and benefit it brings to him, or whether it means the price brought by the material things which remain when put to sale to the best bidder, leaving him still in possession of all those legal rights springing out of and supported by his interest in it, which in case of insurance, or a right of action against the cause or instrument of its loss, may result in restoring to him in money its full original value. It is true, that the act declares that a transfer of the owner's interest in the ship and

freight shall be a sufficient compliance with its conditions, and, by construing this with narrow and literal exactness, this transfer may be confined to the mere wreck and physical remnant of the broken ship, or, if sunk to the bottom of the sea, the mere *spes recuperandi*. But this construction, we think, *hæret in cortice*. The whole language of the act must be taken together, and nothing less will satisfy its meaning or its policy than such a transfer or payment as will include .the full money value to the owner of his interest in the ship, which the statute requires him to sacrifice in order to purchase the immunity which it bestows on that condition alone. For the policy of the act was to encourage investments in ships by limiting losses from the risks of navigation to the amount and value of the investment, and that includes the insurance recovered by force of a premium which, when paid, constitutes part of the investment, the insurance money itself being the produce of the investment, which restores it when lost or impaired. Insurance adds to the ship a value of its own, by imparting to the subject of insurance the quality of reproducing itself or its value in case of injury or loss. It was the policy of the act to encourage the shipping interest by a protection against the unlimited personal liability of shipowners for the acts and defaults of their agents and representatives, with reasonable regard to the rights and interests of others engaged in the same pursuit, and not to put a premium on its destruction by taking away from shipowners a principal motive for regarding either their own or the interests of others. And the language of the statute seems to us not only to bear such a meaning, but fairly to imply it. For certainly every pecuniary advantage or profit which the ownership of a thing actually secures by necessary operation of law may be estimated to ascertain the value of the thing to its owner. The insurance, which in case of damage or loss repairs and restores the vessel or stands in its place, and is its produce and earning, being the purchase money paid for it by virtue of the contract which assumes the risks insured against, is strictly an accessory of the ship insured, as much so as the freight which she earns, and the express mention of the latter, as part of the

interest to be transferred, is not to be held as excluding insurance because not expressly mentioned, for the reason that the mention of freight is sufficient to characterize the nature of the owner's interest to be valued, as including not merely the material remnants of the broken or sunk vessel *in specie*, but as well that which it produces, and which is in truth her representative, and of which it is the meritorious cause and consideration. For the insurance is the price paid by the insurer to the insured as the purchase *pro tanto* of the thing insured when damaged or lost, and, in the hands of the owner or due to him, still remains as the value of an interest in the ship as that existed when damaged or lost, and ought to be accounted for as part of that value as much so as freight paid, though no longer freight money in kind, must still be valued and accounted for by the owner who has received it. The insurance money is the interest of the owner in the ship reduced to money, and, therefore, most accurately measures its value; for, in cases of total loss, actual or constructive, all interest of the owner, even though it be a mere *spes recuperandi*, on payment of the insurance money, passes by operation of law to the insurer. Yet that very interest, thus the property, on abandonment or payment of a total loss, the title to which passes to the insurer, is the same interest, the value of which, by the terms of the statute, must be decreed to the libellant to exonerate the owner from personal liability to any additional extent.

An effort was made in argument by counsel to restrict the meaning of the words " the interest of such owner," as used in Rev. Stat. § 4283, so as merely to distinguish between the several liabilities of part owners; but there is no foundation for this. The words are used as well with reference to the interest of a single owner, as of part owners, where there are more than one. It means, we are constrained to believe, and naturally suggests, not merely the naked title of the owner to the physical materials which constitute the ship, or its wreck, or its remnants, but every interest in, attached to, or growing out of it, capable of pecuniary valuation and measurement, so as to include every right of action accruing to its owner, by con-

tract or by operation of law, growing out of its ownership, or any damage or loss previously occasioned to it by others, embracing rights of actions against others for torts causing the injury, if any there be, and upon policies of insurance or other contracts of indemnity, taking effect in consequence of or notwithstanding the loss. Suppose, for instance, that, after the collision which gave to the libellants the lien and right to proceed against the offending vessel for the loss and damage, the latter had been effectually sold, while still pursuing her voyage, and the title transferred to a purchaser, would not the purchase money, either in the hands of the vendor when paid, or in those of the vendee until paid, notwithstanding the subsequent total loss of the ship itself during the same voyage before reaching her home port, be the measure of the value of the owner's interest to the full amount of which the injured party might recover? It seems to us there can be but one answer to that question, and that in the affirmative. It seems to us equally clear, that no distinction can be drawn between the case just supposed and that of insurance. For the policy of insurance in cases of total loss is analogous to a contract of sale, by which the ship, or what remains of her, or the hope of her recovery, become on the happening of the contingency the property of the insurer, and the insurance money payable, the price, as upon a conveyance. In both cases, the interest of the owner is transferred from the thing to the money which represents it and stands in place of it, and the money is the measure of the value of the interest of the owner in the thing, for it is the price and equivalent paid for it. We cannot bring ourselves to think that Congress intended by limiting the personal liability of the shipowner, in cases where previously his whole fortune was responsible for the wrongs committed through his agents and representatives, to the value of his interest in the ship, which was the instrument of the injury, to permit the innocent party, suffering the damage to go entirely without redress, when the vessel in fault, by disaster subsequently happening during the whole period of the same voyage, has been totally lost, and the owner, by a contract in force when the wrong was done, re-

ceives full compensation by way of insurance for the loss he has incurred, and has thus restored to him the offending vessel, not indeed *in specie*, but in value. It seems to us it is the meaning of the statute that the owner shall receive no pecuniary benefit from his interest in the vessel doing the wrong, which shall not inure to the compensation of him who has suffered the loss which it has caused. And that meaning Congress has taken pains to express by the use of the word "interest," as the subject which, or the value of which, the owner must surrender and transfer or account for, as the price of his immunity from personal liability, because it is appropriate to convey the idea, being large enough to embrace, not the mere legal title to the vessel or the wreck and remnant of her which may be saved from the perils of the voyage, but every claim and benefit which constitutes to the owner its substance and value, capable of measurement in money.